John DOE, et al., Plaintiffs–Appellees, Cross–Appellants,

v.

UNITED STATES of America, Defendant–Appellant, Cross–Appellee.

Nos. 90–3762, 90–3763, 90–3764 and 90–3765.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1991.

Decided Oct. 1, 1992.

George Ripplinger (argued), Ripplinger, Dixon & Johnston, Harold G. Belsheim, Pessin, Baird, Belsheim & Wells, Belleville, Ill., for plaintiffs-appellees, cross-appellants.

Frederick J. Hess, U.S. Atty., Office of U.S. Atty., Crim. Div., Fairview Heights, Ill., Stuart M. Gerson, Office of U.S. Atty. Gen., Anthony J. Steinmeyer, Malcolm L. Stewart (argued), Dept. of Justice, Civ. Div., Appellate Section, Jeffrey Axelrad, Jerome A. Madden, Robin D. Smith, Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendant-appellant, cross-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.[*]

FLAUM, Circuit Judge.

The plaintiffs in these consolidated cases, two minor children and their parents, allege that during the fall of 1984 the children were sexually molested by unknown parties while in the care of the Scott Air Force Base Day Care Center ("Center"). The plaintiff children, although not related, are referred to as "Alexis Doe" and "John Doe." According to the plaintiffs' theory, while the Center employees did not necessarily perpetrate the abuse, they were negligent in supervising the children, thereby allowing Alexis and John to be abused by an unknown person or persons. Following a bench trial, the court entered judgment in favor of the children and awarded each child $25,000 in damages. Jurisdiction is premised on the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b).

## I.

We begin with an abbreviated overview of the facts. At about 8:15 a.m. on September 24, 1984, Alexis' mother took Alexis, then three years old, to the Center. She retrieved her daughter shortly after 3:00 p.m., and during the car ride home Alexis told her mother that an unidentified "purple man" had poked her "gina"—Alexis' word for vagina—with a "scrape." On October 19, 1984, after reading an article in the Scott Air Force Base newsletter discussing allegations of sexual abuse at the Center, John's mother asked three-year-old John whether anyone at the Center had touched him in a "bad way." John responded in the affirmative, and said that a man had touched his penis and a woman had touched his "bombosity"—John's word for buttocks.

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

After unsuccessfully seeking administrative relief, the parents of Alexis and John ultimately filed suit in district court on behalf of themselves and their children. The complaints, premised on the FTCA, sought damages of $8 million for medical expenses and emotional injuries to the parents and to their children. The district court consolidated the cases, and initially granted summary judgment to the government on the ground that the claim asserted was one "arising out of assault [or] battery," 28 U.S.C. §§ 1346(b), 2680(h), and therefore was not cognizable under the FTCA. We reversed, holding that the claims arose out of a breach of an affirmative duty to the victims even if the persons committing the alleged assaults were government employees, and remanded the case for trial. *Doe v. United States,* 838 F.2d 220, 225 (7th Cir.1988). The district court then dismissed the parents' claims for their own emotional injuries, but allowed them to remain as plaintiffs to pursue recovery for their children's medical expenses and emotional injuries.

At the bench trial, the district judge permitted the parents to testify as to the out-of-court statements their children made to them regarding the alleged abuse. It is these statements that form the basis of the government's appeal. The government contends that the children's admittedly hearsay statements did not fall within any exception to the general rule against admission of hearsay, and were therefore erroneously admitted. On cross-appeal, the plaintiffs maintain first, that the court improperly dismissed the parental claims for emotional distress, and second, that the damage awards are inadequate. We affirm.

## II.

Under the residual, or catchall, exceptions of the Federal Rules of Evidence, *see* Fed.R.Evid. 803(24), 804(b)(5), the trial court may admit reliable hearsay that does not fall within one of the traditional, enumerated exceptions. These residual exceptions "accommodate ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial." *Idaho v. Wright,* 497 U.S. 805, ——, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990); *see* Advisory Committee Note to Rule 803(24). Congress intended that the residual exceptions be used sparingly; although trial judges are given considerable discretion in evaluating hearsay offered thereunder, that discretion is "tempered by the requirement that the exception be reserved for exceptional cases." John E.B. Myers, *Child Witness Law and Practice,* § 5.37, at 205 (Supp. 1991). Despite these admonitions, the residual exception is used with some frequency in child abuse litigation. *See, e.g., United States v. Shaw,* 824 F.2d 601, 609 (8th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988); *see also United States v. Dunn,* 851 F.2d 1099, 1101 (8th Cir.1988).

The nation's courts are, unfortunately, awash with child sexual abuse cases; such litigation has been given the dubious label, "tort of the 1990s." *See* Dick Dahl, *Plymouth County Jury Award May Make Child Sexual–Abuse Litigation a New Tort of the 1990s,* 1991 Massachusetts Lawyers Weekly, Apr. 15, 1991. The number of children sexually abused each year in the United States has been estimated at between 60,000 and 100,000, Ann Marie Hagen, Note, *Tolling the Statute of Limitations for Adult Survivors of Childhood Sexual Abuse,* 76 Iowa L.Rev. 355, 357 (1989) (citing L. Karp, *Domestic Torts: Family Violence, Conflict and Sexual Abuse* 154 (1989)), and even these disturbing statistics are underinclusive because many cases go unreported. *Id.* Detecting sexual abuse, and convicting its perpetrators, is problematic because of the lack of witnesses, the difficulty of obtaining corroborative physical evidence, and the typical reluctance or inability of the victim to testify against the defendant. Judy Yun, Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases,* 83 Colum.L.Rev. 1745, 1745 (1983). In light of these circumstances, the out-of-court statements of the child victim take on exceptional significance; a youngster's hearsay statements in sex abuse cases of-

ten constitute the only proof that a crime has occurred. *Id.*[1]

The central issue in such cases typically is whether the proffered hearsay possesses indicia of reliability "equivalent" to the indicia of reliability supporting the traditional exceptions—whether, in other words, "the circumstantial guarantees of trustworthiness" of the hearsay offered under the residual exception are " 'equivalent' to the guarantees that justify the specific exceptions." *Huff v. White Motor Corp.*, 609 F.2d 286, 293 (7th Cir.1979); *see Lee v. Illinois*, 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986); *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).[2] *Idaho v. Wright, supra*, recently rejected the view that a mechanized test should be formulated to determine whether a child's out-of-court statement is reliable, and instead adopted a "totality of the circumstances" approach. Significantly, the Court stated that the trial judge may consider any evidence that sheds light on "whether the child declarant was particularly likely to be telling the truth when the statement was made." 497 U.S. at ——, 110 S.Ct. at 3150. *Wright* identified several factors that trial courts may consider in evaluating the reliability of a child's hearsay statement, including spontaneity, consistent repetition, the mental state of the child at the time the statement was made, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. This list, however, is "not exclusive, and courts have considerable leeway in their consideration of appropriate factors." *Id.* The Court, at least in the confrontation clause context, limited the relevant circumstances to "those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* 497 U.S. at ——, 110 S.Ct. at 3148. That is to say, "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Id.* 497 U.S. at ——, 110 S.Ct. at 3149.

As we previously have recognized, prosecutions based on sexual abuse allegations "place a strain on traditional notions of procedural justice." *Nelson v. Farrey*, 874 F.2d 1222, 1224 (7th Cir.1989), *cert. denied*, 493 U.S. 1042, 110 S.Ct. 835, 107 L.Ed.2d 831 (1990). This is especially so in a case such as this, where the alleged abuse left no physical traces, and where the children were extremely young when the abuse occurred. *See id.* It is against this complex backdrop that we turn to the specifics of this case.

### III.

### A.

The government contends that the hearsay statements of Alexis and John contain

---

1. Numerous states have attempted to address the problem by fashioning "tender years" exceptions to the general rule against hearsay admission. *See, e.g.,* Fla.Stat.Ann. § 90.803(23) (West 1992) (establishing hearsay exception for statements of child victims). No such exception exists within the federal system, however, so courts have attempted to accommodate these statements through the use of other, existing exceptions under the Federal Rules. *See* Eleanor Swift, *The Hearsay Rule at Work: Has It Been Abolished De Facto by Judicial Decision?*, 76 Minn.L.Rev. 473, 498 (1992) ("[E]xpansive readings of Rules 803(2) [excited utterance] and 803(4) [statements for purposes of medical diagnosis or treatment], combined with the liberal use of the Rule 803(24) catch-all exception, create the sense that much of what a child victim says outside of court about being sexually abused will be admitted in federal trials."); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253, 264 (Neb.1990) (upholding admission of "excit-

ed utterance" made by four-year-old child two days after alleged incident and after police questioning); *see also* Joseph Rand, Note, *The Residual Exceptions to the Federal Hearsay Rule: The Futile and Misguided Attempts to Restrain Judicial Discretion*, 80 Geo.L.J. 873 (1992) (heralding as a welcome development the increasingly liberal construction of residual exception).

2. Courts and commentators dispute the reliability of children's accounts of sexual abuse. *Compare, e.g.,* Hollida Wakefield & Ralph Underwager, *Accusations of Child Sexual Abuse* 85–91 (1988) (children's allegations of sexual abuse of limited reliability because children are not necessarily able to differentiate fact from fantasy) *with* Billie Wright Dziech & Charles B. Schudson, *On Trial: America's Courts and Their Treatment of Sexually Abused Children* 57 (1989) ("The veracity of sexually abused children has been analyzed by researchers, all of whom report that false accusations are extremely rare.").

**1076**

inadequate circumstantial guarantees of trustworthiness to justify admission, and maintains, therefore, that the district court abused its discretion in admitting them. According to the government, without these hearsay statements there is insufficient evidence upon which to base a finding of liability.

At trial, the government argued that the parents should not be permitted to testify as to their children's out-of-court statements because Alexis and John were not competent at the time they made the statements, and that even if they were, the statements were hearsay not falling within any exception to the rule against hearsay admission. Tr. 7–8. Without explicitly ruling on the competency issue, the district court acknowledged that the parents' testimony regarding the children's accounts was hearsay, but admitted it because given "the circumstances under which [the parents] received the information from the children, the way that they have told the story, I think there is credibility." Tr. 1054. In written findings, the district court reaffirmed its determination of credibility, and further noted that requiring the children to testify at trial would be psychologically harmful. App. at 4–5, 8–12. On appeal, the government contends that only one indicia of reliability—absence of motive to fabricate—is present here, and that this factor, standing alone, is insufficient to justify admission of the children's hearsay statements.

At the outset, we recognize the obvious difficulty in attempting to employ a consistent application of the residual exception. By its very nature, the exception is subject to varying standards regarding a statement's trustworthiness and the necessity for its use. See Ray Yasser, *Strangulating Hearsay: The Residual Exceptions to the Hearsay Rule*, 11 Tex.Tech.L.Rev. 587, 597, 603–04 (1980). Consequently, some commentators have criticized courts for expanding existing hearsay exceptions beyond recognition, *see, e.g.,* Yun, *supra,* while others have suggested that the trial courts' discretion under the residual exception be restricted to prevent standards of trustworthiness from falling too low. *See,*

*e.g.,* Glen Lenhoff, Note, *The Federal Courts and the Catchall Hearsay Exceptions,* 25 Wayne L.Rev. 1361, 1377 (1979).

Whatever the merits of these criticisms, however, our function is not to establish new standards, or to second-guess the determinations of the trial judge. We review claims of reversible error in a trial court's decision to admit or exclude evidence only for abuse of discretion, and in so doing, give the trial judge great deference. *Littlefield v. McGuffey,* 954 F.2d 1337, 1342 (7th Cir.1992); *Geitz v. Lindsey,* 893 F.2d 148, 150 (7th Cir.1990); *United States v. Iron Shell,* 633 F.2d 77, 86 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Moreover, the trial court is entitled to a "considerable measure of discretion" in deciding whether to admit hearsay evidence under Rule 803(24) in particular. *Moffett v. McCauley,* 724 F.2d 581, 583 (7th Cir.1984); *see also United States v. Vretta,* 790 F.2d 651 (7th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986); *United States v. Howard,* 774 F.2d 838, 845 (7th Cir.1985). As the Eighth Circuit observed in another case involving allegations of child sexual abuse, "Rule 803(24) provides a trial court with some flexibility when it must make a determination as to the admissibility of hearsay evidence, and there is no specific rule governing admissibility." *United States v. Cree,* 778 F.2d 474, 478 (8th Cir.1985). The relevant benchmark is not how we would have ruled had we been standing in the trial judge's shoes, but rather, "whether *any* reasonable person could agree with the district court." *Littlefield,* 954 F.2d at 1342 (quoting *Geitz,* 893 F.2d at 150–51 (citations omitted; emphasis in original)); *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1266 (7th Cir.1988). In reviewing the district court's evidentiary rulings, "we are mindful of the common-sense admonition that '[w]hen the choice is between evidence which is less than best and no evidence at all, only clear folly would dictate an across-the-board policy of doing without.'" *Morgan v. Foretich,* 846 F.2d 941, 943 (4th Cir.1988) (quot-

ing Fed.R.Evid. art. VIII advisory committee's note)).

#### B.

At trial, Alexis' mother testified that she had picked up her daughter at the Center shortly after 3:00 p.m. on September 25, 1984. During the car ride home, Mrs. Doe asked Alexis about her friends and if she wanted to visit the Center again. According to Mrs. Doe, Alexis replied that she had made friends, but asked her mother not to take her back to the Center any more. She further told her mother "that the teacher was very nice to her and that she put water [on] what she called her gina." Mrs. Doe stated:

A: I felt pretty shocked and so I asked her what happened to her gina, why did she need it to feel better, and she said that the purple man had poked it with a ... scrape and that it hurt and so that the white teacher made it feel better by putting water on it.

Q: What was said next?

A: I asked her what, I guess I just tried to figure out what all that meant, and asked her if they had touched her, and she said that yes, you know, yes they had, that they had poked her vagina and that the man said that he was sorry he hurt her, and [I] asked her what else happened and she said that the man had pulled his pants up and down, pulled them down and then pulled them up and then pulled them down, and then the mommy teacher ... opened up her blouse and she said that she showed her titties to the man, and the man peed on both of them, and she had asked me to not take her there any more and she said I called you and called you, mommy, and you wouldn't come.

Tr. 42–43. Upon reaching their home, Mrs. Doe examined Alexis but discovered no visible physical signs of abuse. She then called her husband, a pediatrician at the Base, and told him the story. He told her to come to the Base hospital, which she did, where Alexis was examined by Dr. Donald Dicheson, the Base's chief pediatrician. Like Mrs. Doe, he discovered no signs of physical abuse. Tr. 45–46.

The Does subsequently reported the incident to the police. At the station, Alexis and her parents met with a Sergeant Lofties, and Alexis again stated that a purple man had poked her vagina with a scrape. When asked where the scrape was, Alexis said "it fell off in the car," which, according to Mrs. Doe, was "a new thing she had not told me." Tr. 52. Mrs. Doe testified that she and Lofties then took Alexis to a snack shop and then back to the Center; Lofties went inside, and, during his absence, Alexis made further statements regarding the alleged incident.

I think she was still eating her sandwich or I was trying to get to her [sic] eat the sandwich, and she had said that earlier the purple man had put his penis in her mouth and peed in her mouth and made her throw up her sandwich.

Tr. 55. When bathing Alexis on the evening of the incident, Mrs. Doe, a registered nurse, noticed that "she had a little pin prick or needle prick mark in her toe" which appeared to be "an injection site, where you put the needle and there is just a little dot of blood on it." Tr. 55. In response to her mother's query about the marks, Alexis "said she was screaming and crying and making too much noise when these people had her, and so they gave her a shot and they said that if she was crying any more, they were going to give her another shot." Tr. 55.

The next day, Mrs. Doe took Alexis to the local rape crisis center, where Alexis was interviewed in a play room while Mrs. Doe watched through a one-way mirror. Mrs. Doe stated that her daughter removed the clothing from the dolls and pushed the naked dolls together on their genital areas. Tr. at 65. According to Mrs. Doe, Alexis had never witnessed adults having any kind of sexual relations.

Mrs. Doe then testified that at some point over the next few days, Alexis mentioned that a boy named Joey had been present, and revealed additional details.

I remember her saying that these people gave her a bath after they had squashed her in between them and she couldn't breathe and the man rubbed his penis on her stomach and that they gave her a bath afterwards, they took her clothes off and folded them and gave her a bath, and the purple man told her that if she said anything, he would bite her. . . .

Tr. 66–67. According to Mrs. Doe, Alexis then told her "that the purple man touched the lady's titties, and they did ballet. The mommy teacher did ballet on the purple man, and that the lady said that when she got to be a woman or grown up that she could do ballet on the man, too." Tr. 67. At some point, Alexis also told her mother that while "the purple man and the teacher were in the other room doing bad things," Alexis "was in the kitchen, and the dog was making her food." Tr. 105; *see also* Tr. 67. Alexis told her mother on another occasion that the dog drove her in a police car to a safe place. Tr. 105.

### C.

John's mother testified that upon reading about allegations of child abuse at the Center in the base newsletter in October 1984, she asked John whether anybody had ever touched him or done something bad to him at the nursery (the family's term for the Center):

[A]nd he said yes, they did, and I guess I was in shock that he said yes, so I just remember that I tried to stay calm, and I asked him, I guess I remember, I said, what happened John, and he went on— actually, I said who touched you, and he said a man, and he said a lady. I asked him where they had touched him and John at the time pointed to his penis and to his bottom, and I asked him if the man had a name, and he said yes, I said what was the man's name. He said the man's name was John. I asked him if the lady had a name, and he said no, he just referred to her as a lady.

Tr. 356–57. According to Mrs. Doe, John became "very angry and very uncomfortable," and asked her "why did you take me there?" Tr. 357. Mrs. Doe stated that she decided "not to push John" about the matter until her husband, who was out of town, returned, although in the interim she occasionally raised the issue. In response to questions about the lady's identity, John would say he did not remember, and when asked about the man's name, John "would become very angry and [say] I told you Mom, the man's name is John." Tr. 358. Mrs. Doe testified that John would then tell her that he did not want to discuss the matter any further.

Mr. Doe testified that he waited several days after returning from his trip to see whether John would initiate a discussion of the incident. When he failed to do so, Mr. Doe asked his son whether anything ever happened to him at the nursery. According to Mr. Doe, "without any interruption [John] began a detailed description of what had happened to him." Tr. 538. Mr. Doe said that John "could not tell me where it had happened exactly, what room or anything like that, but he said that a man had touched him on his weenie, his term for penis," and further, "that a woman had touched him on his bombosity, which was his term for his bottom or his buttocks." Tr. 538. Mr. Doe asked if the man had a name, and his son responded, "yes, John," and when asked if the woman had a name, John replied no. When asked what they were wearing, John told his father that the man wasn't wearing any clothes, and that "the lady had red legs." Tr. 538. Mr. Doe stated that John offered this information in response to very general questions about the Center, and that he "didn't initiate the conversation in the context of 'something bad happened to you, didn't it, John.'" Tr. 539.

The Does testified that John later supplemented his story, stating that the "bad people" at the nursery had a snake, which "they put [on] my hand and it bit me." Tr. 557–58 (Mr. Doe). John also drew oval shapes on a piece of paper, and told his father that there were bags used in a game whereby "the man would jump in and out of the bag and then the kids would jump in and out of he [sic] bag" Tr. 603. According to Mrs. Doe, after the incident John began

to draw pictures "of things with straight lines" and cages, and to talk about

being burned. And at one time, at one point he had said the people told me that this is what would happen if I talked, and he drew a picture of a figure and then he scribbled it out with an orange marker and he said this is the fire and this is what would happen to me if I ever told anybody.

Tr. 511–12. Mrs. Doe testified that John drew pictures of two people, and later referred to another little boy, "Tonya," stating "that they did this to Tonya, Tonya was a nice little boy, but they did this to Tonya too." Tr. 512.

### D.

■ The government asserts, correctly, that hearsay not within an enumerated exception is presumptively unreliable, and the burden of overcoming that presumption falls on the party seeking to introduce the evidence. According to the government, because the children's comments satisfy only one indicium of reliability, the absence of a motive to fabricate, the plaintiffs failed to satisfy this burden.

■ In regard to Alexis, the government first argues that her story lacked consistency, because it accumulated new details that grew increasingly "bizarre"—such as the dog who made her food and drove a police car. It is true that reliability generally is enhanced when a child consistently repeats an out-of-court statement more than once, *see Cree,* 778 F.2d at 477 n. 5. *But cf. State v. Robinson,* 153 Ariz. 191, 735 P.2d 801, 811 (1987) ("Consistency does not always guarantee trustworthiness; it could be evidence that the statements were rehearsed."). Conversely, if the details of the abuse vary each time the event is described, reliability is less certain. *See State v. Taylor,* 103 N.M. 189, 704 P.2d 443, 452 (App.1985); *State v. Smith,* 384 N.W.2d 546, 549 (Minn.Ct.App.1986). But it is to *overall* consistency that we look, not constancy with regard to each and every detail. "What is most important is consistency regarding the core details of the experience. Consistency about periph-

eral details is less important." Myer, *supra,* § 5.37A, at 210. In *United States v. Dorian,* 803 F.2d 1439, 1444 (8th Cir.1986), for example, inconsistency did not render a five-year-old sexual abuse victim's hearsay statements unreliable since "it frequently takes a long time for children to share what is really going on and they may then do so in stages, telling a little more each time."

Here, although various peripheral details concerning the alleged abuse expanded over time, the basic framework of Alexis' story remained the same. Indeed, as the government acknowledges, Alexis never waivered in her account of a "mommy teacher" putting water on her "gina." On cross-examination, Dr. Dicheson testified that Alexis' statements to her parents were consistent, and that although three-year-old children typically "have a lot of fantasy and fantasy usually changes moment to moment or the story changes moment to moment," Alexis' parents were concerned because "each time the story was repeated, it seemed to be essentially the same type of message that was being presented." Tr. 198–99. That very consistency led Dicheson to conclude that abuse may have taken place. Tr. 199.

Nor are we troubled that Alexis divulged the specifics regarding the abuse in a piecemeal fashion. Contrary to the plaintiffs' contention, we do not find this, in itself, a circumstantial guarantee of trustworthiness—indeed, under this view the hearsay proponent would be in a no-lose situation: if the story is consistent, it is an indicium of reliability; if it is inconsistent in that the disclosures are offered in stages, it still serves as an indicium of reliability. We believe nonetheless that the *core* consistency of Alexis' story, which held firm with each new revelation, serves as an indicator of trustworthiness.

■ The government further maintains that because many of Alexis' statements were prompted by adult questions, they lacked the requisite spontaneity. *See Wright,* 497 U.S. at ——, 110 S.Ct. at 3150 (spontaneity an indicator of trustworthiness). The government argues that Alexis'

only spontaneous statement was the comment that her teacher was very nice and had put water on her "gina," and that all of her subsequent statements were elicited by the inquiries of her mother and investigators. The government is correct that the more spontaneous the statement, the less likely it is to be a product of fabrication, memory loss, or distortion. *See Morgan,* 846 F.2d at 946. Yet, a lack of spontaneity is not necessarily fatal to the admission of hearsay, especially in the child abuse context. *See State v. Sorenson,* 143 Wis.2d 226, 421 N.W.2d 77, 86 (1988) (use of residual exception in child sexual assault cases even less tied to immediacy of statements because other indicia of reliability support its trustworthiness). Similarly, the fact that a statement is elicited through questioning does not necessarily defeat reliability. As *Wright* recognized, procedural requirements—such as an absence of leading questions—may "in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy ..." *Id.* 497 U.S. at ——, 110 S.Ct. at 3148; *see also Nelson,* 874 F.2d at 1229. Moreover, as the government acknowledges, Alexis' core statements were offered at the child's own initiative, shortly after the alleged incident occurred, with no parental prompting.

As to Alexis' mental state, *see Wright,* 497 U.S. at ——, 110 S.Ct. at 3150, the government maintains that her "matter-of-fact tone" in relating her account of the abuse fails to furnish a circumstantial guarantee of trustworthiness. Commentators have observed, however, that the childhood perspective on sexual experiences "does not produce the shock or excitement that the law presumes to exist after such an event. Quite often, the incident is related as part of the day's activities without any indication from the child that it was traumatic or unusual." Yun, *supra,* at

1757; *see Brown v. United States,* 152 F.2d 138 (D.C.Cir.1945) (three-year-old child calmly reported assault in school that day during normal dinnertime conversation). Moreover, although Alexis reported the incident in a matter-of-fact tone, she became angry and upset when telling her mother that she had failed to come in response to her pleas for help.

Finally, the government claims that Alexis failed to provide "graphic descriptions" of the alleged sexual activity, and that her hearsay statements do not relate details of the sort that could only be acquired through direct sexual contact. *Cf. Nelson,* 874 F.2d at 1229 ("Merely playing with anatomically correct dolls would not have given [the victim] the idea that one might be sprayed in the face with 'white mud' from an erect penis."). At root, the government's dispute is that the descriptions provided by Alexis were insufficiently "graphic" to establish that she had been exposed to some sort of sexual contact.

We disagree. Alexis' age, her knowledge, and her childlike description of the abuse give her statements the ring and quality of truth. *See United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir.1979). She stated that "the man" had "touched the ladies' titties and the mommy teacher had done 'ballet' on the purple man" and that "a purple man had put his penis in her mouth and peed in her mouth and made her throw up her sandwich." These graphic descriptions in childlike terminology are precisely the type that serve as an indicator of veracity; the use of the word "ballet" rather than the phrase "sexual intercourse," for example, indicates that Alexis actually witnessed the event and was not merely coached by someone using adult terms for sexual behavior.[3]

Given the "totality of the circumstances," *see Wright,* 497 U.S. at ——, 110

---

3. We note that Dr. Gerwell similarly testified that during play therapy Alexis "clearly showed some sort of emesis type response, coughing or what we would interpret as being ill or throwing up or having emesis.... That particular scenario is impressive because it certainly would be the kind of thing that would not fit into normal type of exposure or experience of a

child this age, or most children." Tr. 931–32; *see also* Tr. 934 ("It was my conclusion that [Alexis] had been exposed to some type of sexual, inappropriate sexual experience ... [based upon] the details that she produced, particularly the realm of what appeared to be a fellatio incident.") (Dr. Gerwell).

S.Ct. at 3148, we find no abuse of discretion in the admission of the hearsay statements at issue. Alexis' graphic descriptions and consistency strongly suggest that her statements were trustworthy. As the Supreme Court has admonished, the test for admissibility is not a mechanized one. Although, for example, Alexis' mental state does not provide an indicium of reliability, the absence (or weakness) of trustworthiness in regard to one element does not necessitate exclusion of the proffered evidence. Alexis' hearsay statements were properly admitted.

■ Turning to John's statements, we first find that, contrary to the government's contentions, the core of his story remained consistent over time as well. John repeatedly maintained, for example, that the male assailant was named John, that he did not know the female's name, and that the abusers had touched his penis and his buttocks. *See also* Tr. 358 ("His story was very, very consistent with what he had originally told me ... and I asked him again what the man's name was, he would become very angry and said I told you Mom, the man's name is John, and just pretty much was the same story the whole weekend.") (Mrs. Doe). Although his later accounts made references to such things as cages, threats of fire, snake bites, and a playmate, these are peripheral matters that did not alter the nucleus of his story.

■ We have a more difficult time in assessing the spontaneity of John's statements. Admittedly, they lack spontaneity in the traditional sense; yet, this does not automatically render them unreliable. First, as we previously observed, spontaneity in the child abuse context is not necessarily determinative of reliability. *See Sorenson*, 421 N.W.2d at 86 (contemporaneity and spontaneity of statements generally are not as crucial in admitting hearsay statements of young sexual assault victims under the residual exception); *see also Iron Shell*, 633 F.2d at 85–86. Furthermore, spontaneous *answers* to nonleading questions may be deemed reliable in appropriate circumstances. *Iron Shell*, 633 F.2d

at 86; *Robinson*, 735 P.2d at 811 (five-year-old's statements spontaneous where "she explained what had occurred with little prompting."); *State v. McKinney*, 50 Wash.App. 56, 747 P.2d 1113, 1117 n. 4 (1987) ("Statements made in response to questions are spontaneous where the child volunteers the information in response to questions that are neither leading nor suggestive."); *see also Sorenson*, 421 N.W.2d at 86; *State v. Lindner*, 142 Wis.2d 783, 419 N.W.2d 352 (1987). Here, John's parents stated that their son volunteered the specific information when asked general, nonleading questions about the Center. Furthermore, John volunteered additional information to his mother following a November 17 tour of the Center. Moreover, even the use of leading questions, as noted in *Wright*, does not necessarily render a child's out-of-court statements untrustworthy. 497 U.S. at ——, 110 S.Ct. at 3148; *cf. Iron Shell*, 633 F.2d at 92 (authorizing use of leading questions during direct examination of child witness).

It is also significant that in child sexual abuse cases, a delay often occurs between the assault and a statement by the child disclosing it, Yun, *supra*, at 1757; Jean L. Kelly, Comment, *Legislative Responses to Child Sexual Abuse Cases: The Hearsay Exception and the Videotape Deposition*, 34 Cath. U.L.Rev. 1021, 1024 (1985), often because the child fears reprisal or punishment. *See, e.g., People v. Davison*, 12 Mich.App. 429, 163 N.W.2d 10 (1968) (nine-year-old girl delayed making statement for two weeks after assault because of her fear of defendant). In light of this, numerous courts have upheld the admissibility of out-of-court statements made some time after the alleged abuse and in response to questioning by a trusted adult. *See, e.g., Bertrang v. State*, 50 Wis.2d 702, 184 N.W.2d 867, 870 (1971) (fact that child's assertions "are not made within a few minutes or even hours of the alleged assault is not controlling, nor is the fact that they are not volunteered but made in response to questions."); *State v. Superior Court of County of Pima*, 149 Ariz. 397, 719 P.2d 283, 290 (App.1986). Here, given the details of John's accounts—including refer-

ences to the "bad man's" threats to harm John through snake bites and the use of fire—the lack of spontaneity does not defeat a finding of reliability, and lends credence to the child's veracity. *See Fitzgerald v. United States*, 443 A.2d 1295, 1298 (D.C.Ct.App.1982); *see also* Tr. 924 (interviews with John indicated that "he may have known but would not or could not release information ... the suggestion that there were other factors acting to prevent him from being willing to participate and give more information") (Gerwell testimony); Tr. 924–25 (re-enactments of incident in play therapy with John suggested that injury or threat of injury had been involved) (Gerwell).

Admittedly, John's mental state and use of graphic descriptions, alone, do not provide significant support for admission of the testimony. John did become agitated and uncomfortable when discussing the incident, although not extremely so. As to childlike terminology, the words he used— "bombosity" and "weenie," for example— were not necessarily outside a three-year-old's realm of knowledge. Yet, we do not find this defeats admissibility. As we have emphasized, admissibility under the residual exception must be determined on a case-by-case basis, and here, when viewed in context and in totality, we cannot say the district court abused its discretion in admitting John's statements. John's tender age, the consistency of his story, the fact that his story provided a rationale for the lack of contemporaneity, and his voluntary statements in response to general, nonleading questions, support the district court's determination that his statements provided adequate guarantees of trustworthiness to justify admission.

■ Although the government further maintains that the competence of the out-of-court declarant is crucial in applying the residual hearsay exception (here, the district court conducted no inquiry to determine the competence of either Alexis or John), we need not address this argument at great length. In *Wright*, the Supreme Court rejected the contention that a young girl's hearsay statements were *per se* unre-liable, or at least presumptively unreliable, on the ground that the trial court found her incompetent to testify at trial. Although the trial court found that the girl was "not capable of communicating to the jury," the Supreme Court noted that this did not necessarily mean the judge had deemed the girl incompetent to testify. Significantly, the Court stated, "the more reasonable inference is that, by ruling that the statements were admissible under Idaho's residual hearsay exception, the trial court implicitly found that the [girl], at the time she made the statements, was capable of receiving just impressions of the facts and of relating them truly." *Wright*, 497 U.S. at ——, 110 S.Ct. at 3151. The same reasoning applies here. Although, as *Wright* acknowledged, a child's ability to communicate "might be relevant to whether the earlier hearsay statement possessed particularized guarantees of trustworthiness," *id.* 497 U.S. at ——, 110 S.Ct. at 3151–52, because here (under *Wright's* reasoning) the district court implicitly found John and Alexis capable of understanding the facts and truthfully relating them, we do not find that its failure to determine the children's competency renders their testimony inherently unreliable. *See also Morgan*, 846 F.2d at 946, 949. We conclude that the district court did not abuse its discretion in allowing the parents to testify regarding their children's hearsay statements.

## IV.

■ On cross-appeal, the parents contend that the district court improperly dismissed the state common-law counts, premised upon the tort of seduction, for their own emotional injuries suffered as a result of the molestations of their children. Under the FTCA, the United States is, as a general matter, liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The plaintiffs contend that Illinois law—the substantive law applicable here—recognizes this cause of action. The district court disagreed and dismissed the claim. We likewise conclude that Illinois courts would no longer recognize a cause of action for the tort of seduction.

In pressing this claim, the plaintiffs rely exclusively on nineteenth- and early twentieth-century cases. Of course, the mere fact that a case is old does not mean it is no longer good law, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); here, however, we believe the cases the plaintiffs rely upon are both inapposite and rest upon outmoded premises no longer accepted by Illinois courts. As the government points out, the plaintiffs allege that their children were abused as a result of the government's neglect; they do not claim, and the court did not find, that a government agent had perpetrated the abuse. None of the cases relied upon by the plaintiffs allow recovery from a defendant on the ground that a "seduction" was *negligently permitted* to occur and, therefore, are inapplicable here. Moreover, as the district court observed, the seduction cases rest upon a conception of the parent-child relationship, and specifically, the father-daughter relation, as one of master and servant. *See, e.g., Ball v. Bruce*, 21 Ill. 161, 163 (1859) ("If plaintiff was the master and [his daughter] was the servant, and in consequence of her seduction he was deprived of her services, why may he not recover as any other master for the seduction of his servant."); *see also Hobson v. Fullerton*, 4 Ill.App. 282, 284 (1879) (requiring proof of master-servant relationship to recover on seduction theory). This outdated conception clearly is untenable today. *See, e.g. Bullard v. Barnes*, 102 Ill.2d 505, 82 Ill.Dec. 448, 453–54, 468 N.E.2d 1228, 1233–34 (1984) (contrasting nineteenth-century view, "when children were valued largely for their capacity to contribute to the family income," with modern view that "the chief value of children to their parents is the intangible benefits they provide in the form of comfort, counsel and society").

Finally, as the government observes, the type of damages for which the parents here seek recovery are sufficiently analogous to damages alleged for emotional injuries in other scenarios in which Illinois courts have rejected recovery, *see, e.g., Rickey v. Chicago Transit Auth.*, 98 Ill.2d 546, 75 Ill.Dec. 211, 215, 457 N.E.2d 1, 5 (1983) (party must satisfy "zone-of-physical-danger" test, which requires proximity to accident in which direct victim was physically injured and high risk to plaintiff of physical impact, to recover damages for emotional distress); *Dralle v. Ruder*, 124 Ill.2d 61, 124 Ill.Dec. 389, 392–94, 529 N.E.2d 209, 212–14 (1988) (no recovery to parents for loss of their society resulting from nonfatal injury to child), to conclude that recovery would be rejected here as well. As a general matter under Illinois law, "before a plaintiff can recover for negligently caused emotional distress, he must have, himself, been endangered by the negligence, and he must have suffered physical injury or illness as a result of the emotional distress caused by the defendant's negligence." *Siemieniec v. Lutheran General Hosp.*, 117 Ill.2d 230, 111 Ill. Dec. 302, 318, 512 N.E.2d 691, 707 (1987). The plaintiffs here do not satisfy these prerequisites. The district court properly dismissed the parents' claims for recovery grounded on the common-law tort of seduction.

## V.

 The parents' primary contention on cross-appeal is that the district court's damages awards of $25,000 to each child were inadequate. Under the FTCA, damages determinations are governed under the clearly erroneous standard, and the nature and measure of damages are assessed according to state law. *Jastremski v. United States*, 737 F.2d 666, 672 (7th Cir.1984). We cannot overturn the district court's damage award unless its factual basis is clearly erroneous. *Wheel Masters, Inc. v. Jiffy Metal Prods. Co.*, 955 F.2d 1126, 1131 (7th Cir.1992); *Wolkenhauer v. Smith*, 822 F.2d 711, 715 (7th Cir.1987); *Adams Apple Distr. Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925, 930 (7th Cir. 1985). Our task is limited to inquiring whether the trial court abused its discretion; it is not to consider whether we personally would have made the same award. *DeSantis v. Parker Feeders, Inc.*, 547 F.2d 357, 365 (7th Cir.1976); *see also Wolkenhauer*, 822 F.2d at 715.

■ The plaintiffs assign numerous errors to the district court's damages findings. The first involves the court's reference to the anatomical dolls used during the course of the investigations. In assessing damages, the district judge observed that the children's current psychological problems, which we discuss below, may not have been caused by the abuse, but "could well have been caused by something else, for example, the use of anatomically correct dolls by the Air Force and Illinois state investigator, Dr. Gerwell, or the people at [the] Rape Crisis Center where the Air Force referred the Does." App. at 6, 12.

The plaintiffs are correct (as the government concedes) that under Illinois law, "a person injured through another's negligence can recover from the original tortfeasor not only for the original injury but for any aggravation of the injury caused by a physician's malpractice, assuming that there was no want of ordinary care in the selection of the physician." *Gertz v. Campbell*, 55 Ill.2d 84, 302 N.E.2d 40, 43 (1973). According to the plaintiffs, since the government is the original tortfeasor, and the sexual abuse constitutes the original injury, the government also is liable for any enhanced traumatization caused by the government investigators' use of anatomically correct dolls in diagnosing and treating the children's abuse. While this may be correct as a purely legal matter, as a factual matter the district court did not, contrary to the plaintiffs' contention, explicitly find that the use of the dolls had resulted in emotional damages to the children. The plaintiffs' contention therefore fails.

■ The plaintiffs also contend that the court erred in "failing to consider elements of damage in the same manner a jury would have." Underlying this contention is the following statement by the district court:

I can recognize the parents feel that these children have been severely traumatized and damaged. If I were in your position, I would feel the same way. If this were my child and my grandchild, I would have the same feelings that you have. I can't indulge the luxury of approaching the case from that standpoint. Tr. 18. According to the plaintiffs, the judge erred because he "should be able to let his own emotions be a guide" in assessing damages. To buttress their claim, the plaintiffs provide capsule summaries of six sexual abuse cases yielding larger verdicts than the one rendered here. But aside from the superficial similarity of subject matter, these cases offer little in the way of useful comparison. That a six-year-old Texas boy suffering from chronic post-traumatic stress syndrome recovered $237,-000 plus attorney fees following sexual abuse by a bus driver, *see Spann v. Tyler Indep. School Dist.*, No. TY 6 213 CA (E.D.Tex. Mar. 25, 1988), does little to illuminate the propriety or impropriety of the damages verdict here. We believe that the judge's statements were merely expressions of sympathy to the parents, and agree with the government that the court here simply recognized that a factfinder—be it judge or jury—must base its damages determination on the evidence and the appropriate legal standards, rather than adopt the perspective of the aggrieved party.

Finally, emphasizing the preponderance of the evidence standard, the plaintiffs dispute the court's finding that the plaintiffs had failed to adequately prove future or permanent emotional damages to either John or Alexis. In reviewing the damages ruling in this regard, it is helpful first to review the court's ruling on liability, for this determination affects its damages assessment. In its oral ruling that the plaintiffs had proved by a preponderance of the evidence that some sort of abuse had occurred, the court emphasized:

I do think that these children were molested in some term of that word, they were molested in some way. I do not think that there was any—well, obviously from the evidence, there was no objective evidence of any physical injury, but there doesn't have to be. The slightest touch would have breached the duty, and would have resulted in an actionable situation.

Tr. 1057. As the government correctly observes, it is this conclusion that lays the foundation for the court's assessment of damages. We turn now to the awards in regard to each child.

■ Shortly after the molestation occurred, John began suffering extremely severe nightmares, known as "night terrors." He also began to engage in violent behavior, and became obsessed with violent themes in his play—ranging from an insistence on carrying knives, guns, and swords, to an obsession with sharks, viewing the movie "JAWS" some 100 times over a span of a few months. After the frequency of his night terrors alarmed his parents, John spent two and one-half years in therapy with a clinical psychologist, George Kinsey. According to the plaintiffs, "John Doe is a troubled child." This may well, unfortunately, be all too true; but to recover damages the plaintiffs must establish to the factfinder both a nexus between John's emotional damages and the molestation, and that the damages are permanent or certain to recur in the future.

■ Under Illinois law, the plaintiff has the burden of establishing that damages were sustained, and of providing the court with a reasonable basis for computing those damages. *Adams Apple*, 773 F.2d at 930; *Schoeneweis v. Herrin*, 110 Ill.App.3d 800, 66 Ill.Dec. 513, 519, 443 N.E.2d 36, 42 (1982). "Damages may not be awarded on the basis of conjecture or speculation; if the plaintiff establishes that he is entitled to damages but fails to provide a proper basis with which to determine those damages, he may be awarded only nominal damages." *Adams Apple*, 773 F.2d at 930; *Schoeneweis*, 66 Ill.Dec. at 519, 443 N.E.2d at 42. Damages are legally recoverable under Illinois law if they can be proved to a degree of reasonable certainty. *Chicago Title & Trust Co. v. Walsh*, 34 Ill.App.3d 458, 340 N.E.2d 106 (1975); *Cummings v. Chicago Transit Auth.*, 86 Ill.App.3d 914, 42 Ill.Dec. 159, 164, 408 N.E.2d 737, 742 (1980).

Here, the district court found no evidence to relate causally to either John's preoccupation with violence or his night terrors to his abuse while under the Center's care, and no evidence to show that John will need future medical or psychological treatment. Further, the court credited Dr. Gerwell's testimony that little, if any, damage, emotional or otherwise, should result from the incident, and found no evidence of any permanent or future damages. We find that the court did not abuse its discretion in determining that John's future or permanent damages were not established to a degree of reasonable certainty.

It is true, for example, that children often experience anxiety attacks soon after abuse has occurred, which may manifest itself through increased fear and nightmares. Hagen, *supra*, at 359; *see also* Kinsey Dep. 53. But this does not translate into a causal relationship between John's abuse and his nightmares. *See* Kinsey Dep. 60 (although quite often children have nightmares subsequent to sexual abuse, "that's not the only reason why, of course."). Indeed, although Kinsey noted that John's nightmares and fixation with monsters is "consistent" with a history of sexual abuse, he declined to find a causal relationship:

> Again, you know, the fact that John had night terrors and had marked changes in mood and difficulty with frustration and so forth. There can be a lot of contributing factors to that; having had a trauma in his life could be one of those factors ... could be. There's no way for me to know for sure.

Kinsey Dep. 61. The plaintiffs also maintain that the district court improperly concluded that John had not been grossly traumatized by the event because he did not immediately report the incident to his parents and appeared bored during his interview with Dr. Gerwell. Whether or not the court's observations on these points were correct as a factual matter, however, its assessment of damages did not flow from these comments. Rather, the court emphasized that the plaintiffs had not established any *causation* between John's emotional problems and the abuse. *See* App. at 12.

Moreover, although the plaintiffs point out that John required extensive therapy to

treat the night terrors, the court awarded damages to cover these costs. The damages the court declined to award were for alleged future damages. Although the plaintiffs focus on John's preoccupation with violence and his night terrors, they do not provide the necessary link between these behaviors and the abuse. The range of emotional problems suffered by John, coming as they did on the heels of the abuse, leads one to conclude intuitively that they are linked to one another; but, as noted, damages awards may not be based on mere intuition or speculation alone, and the trial court did not abuse its discretion in finding that a causal relationship was insufficiently established.

 With regard to Alexis, Mrs. Doe testified that for an approximately two-week period following the abuse, Alexis became depressed, very quiet, and withdrawn. Tr. 76. According to Mrs. Doe, during the next couple months Alexis "masturbated a lot with her dolls on her bed, she would take all their clothes off and be like a third person with two dolls.... She would rub her vagina where the dolls [sic] vagina would be, and there was [sic] always three of them." Tr. 76. Mrs. Doe further testified that Alexis played as a "participant" with the dolls for approximately three years, and that although Alexis no longer "get[s] on the dolls any more and participate[s], ... her dolls do have intercourse, she takes their clothes off and Barbie and Ken also have intercourse." Tr. 77. Mrs. Doe also testified that Alexis exhibits an aversion to any show of affection between her mother and father. "[S]he complains a lot when my husband and I do, show each other simple affection, a hello kiss from work, she comes up and tells us to just stop that, that's nasty and that's dirty, which is very different from other children." Tr. 77. According to Mrs. Doe, Alexis gets angry when she sees such kissing, Tr. 78, and her father testified that since the incident Alexis is "deathly afraid of anyone vomiting." Tr. 233. Mrs. Doe stated that she had no plans to seek additional therapy for Alexis in the future, "unless I can see that things just aren't going right with her and she

needs that. I fear making this an issue for her to identify really strongly with," Tr. 80, but indicated that she had not ruled out therapy if it is needed in the future. Tr. 81; *see also* Tr. 236 (Mr. Doe).

As with John, the district court determined that the plaintiffs had not established the necessary link between the abuse and Alexis' behavior. The following statement by the district court regarding Alexis' preoccupation with sexual matters is illustrative:

> Why do we assume that it's a result of this incident? Now it may well be, I am not saying it isn't. I am just saying that it's your burden to prove, just as it was your burden to prove that this happened, it's your burden to prove that her reaction to displays of affection between her parents is causally related to this incident. You have to prove that. I can't assume that.

Tr. 1065. The plaintiffs contend that, under this reasoning, a plaintiff never could recover for emotional injuries, which by their very nature lack tangible physical evidence. In our view, however, the district court did not apply such a restrictive approach. Several times during the plaintiffs' closing argument, the court indicated that the plaintiffs had failed to provide a sufficient link, even if that link was only in the way of circumstantial evidence. The court did not require tangible, physical evidence but only a causal link, which it did not find. *See, e.g.,* Tr. 1066 ("What I do expect ... is some expert opinion that will tie these two things together, and there isn't. There is absolutely no evidence, *not even circumstantial,* because we can think of all kinds of things that would cause—the same way with the nightmares with John, is there a child that hasn't had nightmares, and for various reasons, for many reasons, but there is nothing to tie the nightmares to this.") (emphasis added); Tr. 1069 ("I think that a psychiatrist or a qualified psychologist with experience and background in these things could have opined something for us.").

 The plaintiffs also argue that the abuse negatively affected Alexis' family

environment—for example, Alexis' parents find themselves engaging in overprotective behavior—and that the resulting damages are recoverable under Illinois law. Although Dr. Gerwell did testify that the negative repercussions could be magnified by the children's environment and the way it is influenced by the abuse, Tr. 938, the court did not abuse its discretion in refusing to render an increased damages award on this basis.

The district court's statements indicate that, had the plaintiffs more clearly established some sort of link between the children's behavior and the abuse, the damages awards would have been greater. The evidence provided by the plaintiffs did not establish that future damages were reasonably certain to occur, or even that the existing behavioral problems were more probably than not a result of the sexual abuse. Dr. Gerwell, for example, stated that in a single incident scenario, such as that which occurred with Alexis and John, standard criteria "would dictate that there would be minimal long term recall, if any, or any long term effects...." Tr. 939. Gerwell noted that he had yet to deal with a case in which the individual independently recalls sexual abuse before approximately age five or six, and further stated that "it would be conjecture" to say that Alexis' current conduct is necessarily related to the prior abuse. "It may sound logical to make that leap, but in our field, we have found quite clearly that all kinds of other things can precipitate behaviors." Tr. 941–42; *see also* Tr. 942 ("it becomes very very cloudy as to what is causing behaviors") (Gerwell); Tr. 942 ("In my opinion I would say it is extremely unlikely" that the abuse might or could have caused the reactions exhibited by Alexis) (Gerwell). The plaintiffs offered no credible testimony to counter Gerwell's statements.

Again, we emphasize the narrow scope of our review. We are limited to reviewing the district court's determinations under an abuse of discretion standard. As the government correctly observed in its brief, the district court did not credit every detail of the children's stories; it concluded only

that the plaintiffs had proved, by a preponderance of the evidence, that the children had been subjected to some form of improper touching while under the Center's care. In assessing damages, the court determined that the plaintiffs had failed to establish the necessary causal link between that touching and the alleged resulting psychological harm. The effect of childhood sexual abuse varies with the individual, Hagen, *supra*, at 359, and while clinical studies suggest that sexually victimized children share recurrent emotional and psychological characteristics that manifest in later adult life, *id.*, general statistics do not establish causation in a specific case.

Perhaps in the future, experts will develop new methods for assessing damages in cases involving unique emotional traumas, such as those resulting from child sexual abuse. On the liability end, courts and legislatures have increasingly permitted the tolling of the statute of limitations for adult survivors of child sexual abuse. *See generally* Hagen, *supra*. Perhaps similarly novel approaches—akin to those developed in other contexts, *see, e.g.*, Marcus L. Plant, *Periodic Payment of Damages for Personal Injury*, 44 La.L.Rev. 1327 (1984) (analyzing use of installment payment of judgments in products liability and medical malpractice cases)—likewise will emerge on the damages front. But that is an issue for another day, and another forum. *Cf. id.* at 1333 (although occasionally employed solely by judicial decision, incorporation of periodic payment plans in judgments involves such a substantial departure from common-law practices that it requires statutory authorization). On the facts and law before us, we find that, although a reasonable factfinder might reach a different conclusion, the district court did not abuse its discretion in setting the children's damages awards.

Affirmed.