2000 SD 45

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Robert LeRoy ANDERSON, Defendant and Appellant.**

**No. 20192.**

Supreme Court of South Dakota.

Argued Feb. 15, 2000.

Decided March 29, 2000.

---

648

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, for plaintiff and appellee.

John A. Schlimgen, Sioux Falls, for defendant and appellant.

GILBERTSON, Justice

[¶ 1.] A jury convicted Robert Leroy Anderson (Anderson) of kidnapping Piper Streyle (Piper) pursuant to SDCL 22–19–1(2). He was sentenced to life imprisonment in the state penitentiary. In this appeal, Anderson raises five issues for our review. We affirm.

**FACTS AND PROCEDURE**

[¶ 2.] At the time of her kidnapping, Piper was a twenty-eight year-old wife and mother who lived with her husband, Vance, and their two small children, Shaina and Nathan, ages three and two. The Streyle family lived in a trailer home in rural McCook County. There, they ran a children's bible camp each July.

[¶ 3.] Piper was last seen by her husband on Monday, July 29, 1996, when he left for work at 6:20 a.m. Before he left for work, Vance arranged with Piper to call home at noon to find out where she was going to leave the children before she went to work. When Vance left for work, the house was neat and tidy. Later that day, Piper failed to show up for work. A co-worker of Piper's called the Streyle residence to check on Piper but could only reach Shaina. Shaina, extremely agitated, did not know the whereabouts of her mother. The authorities were contacted and when they arrived at the Streyle residence, they found the Streyle children alone, with Shaina extremely upset.

[¶ 4.] The evidence at the Streyle home suggested Piper had been kidnapped. The inside of the trailer was in disarray and Piper's purse and glasses were still there. A step to the front porch was overturned with nails sticking up, as indicating a struggle had occurred. Missing from the residence was Piper's black and white t-shirt with the words "Code Zero" on the front, and Nathan's blue tent.[1] An expended .9–mm pistol shell casing was found in the driveway.

[¶ 5.] In September 1996, a large-scale search for Piper was conducted in the area of the Big Sioux River near Baltic, South Dakota. The searchers found a vibrator, a clump of duct tape, and half of a black and white t-shirt with "Code Zero" on the front. The shirt and tape were found close to each other. A large number of light brown human hairs, varying from two to six inches in length, were stuck to the duct tape. Unidentifiable human blood was also on the duct tape. The other half of the "Code Zero" t-shirt was turned in by a citizen on November 15, 1996. He had originally found the shirt lying on a road on July 29, 1996.[2]

[¶ 6.] Law enforcement's investigation of Piper's disappearance began focusing on Anderson, especially after he admitted he had been at the Streyle home on the morning of July 29. Vance remembered that on Friday, July 26, 1996, Anderson had visited their home. Anderson was wearing a black baseball cap, and his vehicle appeared to be dark and dirty. Vance remembered Anderson acted very strangely,

1. Vance and Piper gave Nathan this blue tent for his birthday just three days earlier. The fabric from the tent was missing from the trailer but the four poles remained.

2. The citizen found the shirt as he passed beneath Interstate 29 through an underpass near Baltic at approximately 1:00 p.m. He thought the shirt was a referee's shirt, but when he discovered it was not, he threw it under the car seat and forgot about it. He eventually remembered it on November 15, 1996, and turned it in to law enforcement.

standing there waiting for Vance to speak. Eventually, Anderson asked about the bible camp. While Vance explained that he would mail Anderson a brochure on the camp, Piper came to the door with paper and a pen so that Anderson could write down his name and address. While Shaina watched, Vance introduced Anderson to Piper.

[¶ 7.] A public request for information led to reports from Donnie Theel and Darrell Goth that a black vehicle had been in the area of the Streyle trailer on July 29, 1996. Theel, a highway worker, was driving a road grader by the Streyle home on July 29 at approximately 9:45 a.m. As he approached, a black vehicle turned around in the road near the Streyle trailer. The vehicle was a Bronco or Blazer, colored a faded "kind of blah" black. Theel observed this vehicle two more times that morning, first at about 10:45 a.m., then at 12:30 p.m.

[¶ 8.] The other eyewitness, Goth, had gone to the home of a relative that morning at approximately 10:00 a.m. and stayed an hour, measuring the roof. The house was across the road and northeast from the Streyle trailer, about a block and a half away. Goth reported he heard the Streyle door open when he was about halfway finished, and heard unidentifiable voices, then the door closed. When Goth left at around 11:00 a.m., he saw a dark-colored pickup go by, headed north, just before Theel's road grader passed. The dark vehicle did a U-turn in the road about a quarter of a mile away, and headed south.

[¶ 9.] Finally, Tim and Sara Beaner also saw the dull black Bronco near the Streyle home on July 29. The Beaners testified they first passed the Streyle home at 11:45 a.m. They saw Shaina and Nathan standing alone by the roadside, looking upset. When the Beaners came back past them at approximately 12:10 p.m., the Bronco was blocking the driveway. They saw a man in a black baseball cap walking from the house to the Bronco.

[¶ 10.] After interviewing Anderson, the police obtained search warrants for his blue[3] Bronco, home and clothing. When officers examined the Bronco, they found substantial evidence linking Anderson to Piper's kidnapping, including several relevant store receipts. A receipt dated July 29, 1996, at 8:13 a.m. from the Menards store at Sioux Falls recorded Anderson's purchase of a roll of duct tape, a paintbrush, and a 5-quart paint bucket. Another receipt indicated his purchase of black Tempera paint on July 25, 1996 at a Ben Franklin Crafts store in Sioux Falls. When an officer asked Julie Bradfield, a clerk there, if the Tempera paint would wash off, she replied "[w]hat are you going to do, paint a car?" Bradfield told the officer that Anderson had also asked her that question on July 25th. She subsequently positively identified him in a lineup and in court.

[¶ 11.] After examining the Bronco, officers noted black paint on the blue Bronco. Rex Riis, of the State Forensic Lab, took samples of the black substance from nine places on the Bronco's exterior. He compared them to black Tempera paint visually, chemically, and microscopically and concluded the black substance was the same as the Tempera paint. Riis also confirmed the black Tempera paint was on numerous objects in the Bronco. Later testing found it took twenty-two minutes to paint a Bronco of the same size and type as Anderson's. The paint dried quickly, giving it a dull, flat black appearance. When the paint had dried, it could be easily washed off the Bronco except for traces of residue in places protected from the force of the water.

[¶ 12.] Following this investigation, the State charged Anderson with two counts of

---

**3.** When the officers found Anderson's Bronco, its color was blue with a stripe along the sides. Except for the color, however, the year and make of Anderson's vehicle was identical to the vehicle seen by witnesses around the Streyle home.

kidnapping.[4] On May 8, 1997, a jury convicted Anderson of kidnapping Piper pursuant to SDCL 22–19–1(2), to facilitate the commission of a felony, specifically rape. The trial court sentenced Anderson to life imprisonment in the state penitentiary. Additional facts will be recited herein as they relate to specific issues.

[¶ 13.] 1. Did the trial court abuse its discretion in denying

Anderson's motion for mistrial after Shaina failed to

testify.

[¶ 14.] *Statements of child witness, Shaina.*

[¶ 15.] Shaina was the minor child witness in this case. Shaina had been present at the time Piper was kidnapped. At 3:00 p.m. on July 29, 1996, Piper failed to show up at work. As it was unlike Piper to be late for work without calling first, Patty Sinclair, a co-worker, called the Streyle residence. Shaina answered the phone. Sinclair asked the little girl whether her mother was home. Shaina responded "no." When Sinclair asked whether her father or a babysitter were there, Shaina also replied "no." Shaina then said very softly, "[t]hey [probably] killed ..." She then said "bye" and hung up.

[¶ 16.] When Sinclair called five minutes later, Shaina answered again, but was crying "extremely hard," almost hysterically. Sinclair could barely understand what Shaina was saying and tried to keep the little girl calm. Sinclair testified at trial:

As I recall, I asked her to calm down because I could not understand her and she said that she didn't – that her mommy was – a – that she didn't want her mommy to die and she said that twice.

She didn't want her daddy to die and she didn't want her daddy to be hurt, as I recall.

Shaina told Sinclair her mother had left "a while ago ... with a man in a black car."[5] Shaina also indicated she knew the man who had left with her mother. Sinclair stayed on the phone with Shaina for 45 to 50 minutes until the phone was hung up at 4:50 p.m. During this phone call, 911 was contacted and the McCook County Sheriff Gene Taylor, was alerted.

[¶ 17.] When Sheriff Taylor reached the Streyle home at 5:09 p.m., there was no response when he knocked on the front door. However, the inner door to the house was open. Hearing a child's voice, Taylor stepped inside and yelled "is anyone home?" When there was no answer, Taylor went to the rear of the house where he could hear a child's voice. It was in the rear bedroom he found Shaina crying.

[¶ 18.] Taylor testified that Shaina told him she did not know where her mother was but that her father was at work. She also told him her mother was going to die. Taylor searched for and found Nathan. He also noticed the house was in disarray.

[¶ 19.] Vance called home shortly thereafter to find out where his children were. He had gone to the babysitter's house but discovered the children were not there. Taylor instructed Vance to come home immediately. Vance arrived home at approximately 6:00 p.m., where he found Nathan in a "wiped out" state, while Shaina exhibited excitement, fear and anxiety. Shaina "babbled and chattered" with him. Vance testified: "[i]n order of sequence, she told me that he took my mommy. He took the tent. That's okay. We have another one. And then she proceeded to express to me that he left in a black vehicle, all black and

---

4. Anderson was not able to establish a complete alibi for his whereabouts on July 29, 1996. While he called two neighbors as witnesses to establish a partial alibi, their accounts depicted him taking the big speakers out of the cargo area of his Bronco. This strategy essentially failed as the State in closing argument characterized the removal of the speakers as "clearing the decks for action."

5. Shaina used the term "car" loosely, as she also used it to describe a pickup truck.

that she [Piper] was not coming back." Then it became "very, very difficult to understand what she was even trying to communicate."

[¶ 20.] On July 30, 1996, agents showed Vance and Shaina a photographic lineup, which included Anderson's driver's license picture. Neither were able to pick out a photograph of the man they had seen. However, as soon as law enforcement officers met Anderson, they realized the driver's license picture was out of date. Special Agent Barry Mennenga observed that Anderson's hair was now considerably shorter, more receding and he was clean-shaven except for a small mustache. Thus, this led to a second lineup on August 1, 1996, with a current photograph taken at Anderson's interview on July 30, 1996. At that time Vance was able to positively identify Anderson. Shaina identified Anderson without hesitation[6] from the lineup as well, indicating "that the picture she identified was the man that took her mommy and she was going to die. He was going to kill her."

[¶ 21.] *A. Competency of Shaina.*

[¶ 22.] Anderson argues the minor child witness, Shaina, was not competent to testify at trial because at the time of Piper's disappearance, she was only three years and eleven months old. At the time of trial Shaina refused to testify. Thus, Anderson argues, he was prejudiced because her failure to testify led to admission of inadmissible hearsay.

[¶ 23.] Determination of whether a witness is competent to testify is within the trial court's discretion. *Jopling v. Jopling,* 526 N.W.2d 712, 716 (S.D.1995). Thus, the trial court's determination of competency will be reversed only upon a showing of abuse of such discretion. *State v. Cady,* 422 N.W.2d 828, 829 (S.D.1988)

(citing *State v. Lufkins,* 381 N.W.2d 263 (S.D.1986); *State v. Phipps,* 318 N.W.2d 128 (S.D.1982)). *See also Garrard v. State,* 335 So.2d 603–04 (Fla.Dist.Ct.App. 1976), *cert. denied,* 342 So.2d 1101 (Fla. 1977) ("[A] decision upon the competency of a child to testify is one peculiarly within the discretion of the trial judge because the evidence of intelligence, ability to recall, relate and to appreciate the nature and obligations of an oath are not fully portrayed by a bare record."); *State v. Pace,* 301 So.2d 323, 325 (La.1974) (noting a trial judge.is vested with wide discretion in determining competency and on appeal, its ruling is entitled to great weight, as it has had the opportunity to see and hear the child).

[¶ 24.] SDCL 19–14–1 (Rule 601) provides the general rule of competency: "[e]very person is competent to be a witness except as otherwise provided in chapters 19–9 to 19–18, inclusive." Generally, there is no arbitrary age which prohibits a child from testifying. *Phipps,* 318 N.W.2d at 130 (citing *State v. Lutheran,* 76 S.D. 561, 564, 82 N.W.2d 507, 509 (1957)). In order to be a competent witness, a child must have "sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility...." *Id.* (citing *State v. Leonard,* 60 S.D. 144, 145, 244 N.W. 88, 89 (1932)).

[¶ 25.] Before the testimony of Shaina was to be received, the trial court conducted an in-camera hearing to determine whether she was competent to testify. At the time of this hearing, Shaina was four and one-half-years old. During the first part of the hearing, the trial court observed and participated with Shaina in a play environment. The court and Shaina's counsel, Lorrie Miner (Miner) asked Shaina simple questions at varying points in the play session to make her feel at ease.

---

6. There can be no doubt that Shaina positively identified Anderson. Shaina was shown six individual Polaroid film shots. She was able to point out Anderson. Also, at one point, Vance handed her all six photographs. She said "[d]addy let me show you which one it is and she went through them again and she showed [him] the same identical picture" of Anderson.

At different times Miner asked Shaina whether she would be lying if she made certain untrue statements. For example, at one point Miner asked Shaina "[s]o if I said there was a blue cow in [the room], would I be telling the truth or telling a lie?" Shaina correctly replied "[l]ie." Miner also asked Shaina "[a]nd if you are asked at some time to tell the truth, will you tell the truth?" Shaina responded "[o]h, yep."

[¶ 26.] After the in-camera session with Shaina, the court proceeded with the second portion of the competency hearing. Dr. Cynthia Pilkington, Ph.D., a child psychologist specializing in dealing with children under the age of twelve, testified. Dr. Pilkington, Shaina's treating psychologist, testified that Shaina was able to observe and recall quite accurately and was a typical communicator for her age. Defense counsel suggested to Dr. Pilkington that children of Shaina's age are typically unreliable reporters of events. However, she "totally disagree[d]," stating that "[t]hree year olds can relate information, personal experiences. It may not be logical, but they can certainly relate what has happened to them."

[¶ 27.] At the end of the hearing, the trial court made its findings as to the competency of Shaina. The court found Shaina had the ability to recollect certain things, referring to a specific moment during the play session where it brought out a bag of multi-colored jellybeans. The court found that Shaina picked out the right color of jellybean each time she was asked to identify a certain color. The trial court also found that Shaina remembered it preferred black jellybeans over any other color, and that Shaina did not have to be requested to give a black jellybean, but rather volunteered it to the court.

[¶ 28.] The trial court also found Shaina had the ability to communicate as a normal four and a half-year-old. *See State v. Stewart*, 641 So.2d 1086, 1089 (La.App. 1994), *cert. denied*, 648 So.2d 1337 (La. 1995) (holding four-year-old child witness

to murder indicated she understood the difference between truth and lie, and seemed to have intelligence that one of a similar age and under similar circumstances would possess).

[¶ 29.] Finally, as to the ability of Shaina to tell the truth, the trial court found she knew the difference between right and wrong. The court also found Shaina was "of sufficient age that any testimony that she would give would be to the best of her ability, her remembrances."

■ [¶ 30.] Our review of the interchange between the court and Shaina clearly indicates a sufficient ability to observe, recollect, communicate and tell the truth to satisfy the minimal standards of competence. This Court has stated there is a preference to allow a witness to testify and allow the jury to evaluate the testimony. *Leonard*, 244 N.W. at 89. In *Leonard*, this Court found in the cases where incompetence of an infant witness was urged, the result was "to sustain the action of the trial court in permitting the witness to testify, and in [such] cases this court refused to interfere with the trial judge's discretion." *Id.* (citing *State v. Reddington*, 7 S.D. 368, 64 N.W. 170 (1895) ; *State v. Southmayd*, 37 S.D. 375, 158 N.W. 404 (1916)). *See also State v. Marr*, 673 A.2d 452, 453 (R.I.1996) (explaining the general rule is "that doubts [of whether a child witness is competent] should be resolved concerning minimum credibility of the witness in favor of permitting the jury to hear the testimony and judge the credibility of the witness for itself."). The trial court in this case had the advantage of having the opportunity to see and hear the child during the play session, and thus was in a better position to observe the child's competency. After a review of the record we hold the court did not abuse its discretion in finding Shaina competent to testify.

[¶ 31.] *B. Shaina's failure to testify.*

[¶ 32.] Anderson made a motion before trial to prevent the State from referring to

Shaina's statements which made reference to the possibility of Piper's death. The State argued Shaina's statements were relevant and admissible as excited utterances or present sense impressions. The trial court denied Anderson's motion for the purposes of opening argument, but cautioned the State that the statements would be subject to its evidentiary rulings later in the trial.

[¶ 33.] In its opening argument the State discussed Shaina's statements of July 29, 1996. During the argument no reference was made to Shaina's identification of Anderson. The State did say that Shaina might testify during the trial, but cautioned "sometime during the course of trial, we're going to call her to testify. We don't know what she's going to say. She may decide to answer some questions for us and she may pull her blanket over her head."

[¶ 34.] Three days before Shaina was scheduled to testify, Vance testified about his initial failure and later success in identifying Anderson in the lineups. Vance did not refer to Shaina's participation in any lineup. On cross-examination, after having Vance repeat that he was unable to pick out Anderson at first, Anderson's counsel raised the issue of Shaina's failure to identify Anderson on the first lineup. The State, on redirect, corrected the impression Anderson left that Shaina was unable to identify him. Vance testified that Shaina had in fact identified Anderson in a later photographic lineup after she had been shown his current photograph.

[¶ 35.] When Shaina was called to testify, she refused. Anderson argued to the trial court that he was misled into planning his defense around Shaina's testimony and requested a mistrial and a new trial before a jury "who hasn't been infected with promises that the child was going to say incriminating things about Mr. Anderson." Anderson also argued Vance had been allowed to testify regarding Shaina's photographic lineups. The State argued Anderson misrepresented the record as it

had made no reference to what Shaina would testify to and indicated she might be totally unresponsive.

[¶ 36.] This Court reviews a trial court's denial of a mistrial motion under the abuse of discretion standard of review. State v. Anderson, 1996 SD 46, ¶ 21, 546 N.W.2d 395, 401. In *Anderson*, we stated:

> In reviewing the grant or denial of a motion for mistrial, we have noted that:
>
> Trial courts have considerable discretion not only in granting or denying a mistrial (*State v. Closs*, 366 N.W.2d 138, 143 (S.D.1985)) but also in determining the prejudicial effect of a witness' statements. *State v. Michalek*, 407 N.W.2d 815, 818 (S.D.1987). Only when this discretion is clearly abused will this court overturn the trial court's decision. *Id.; State v. Farley*, 290 N.W.2d 491, 494 (S.D.1980).
>
> To justify the granting of a mistrial, an actual showing of prejudice must exist. *Closs*, 366 N.W.2d at 143; *State v. Clabaugh*, 346 N.W.2d 448, 451 (S.D.1984). Prejudicial error for purposes of determining whether error constitutes grounds for mistrial is error 'which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it.' *Michalek*, 407 N.W.2d at 818 (citing *State v. Dokken*, 385 N.W.2d 493, 498 (S.D.1986)).
>
> *State v. Myers*, 464 N.W.2d 608, 609–10 (S.D.1990) (quoting *State v. Blalack*, 434 N.W.2d 55 (S.D.1988)); [*State v. Oster*, 495 N.W.2d 305, 310–11].

*Id.*

[¶ 37.] We find the record is clear as to this issue and agree with the trial court's decision to deny Anderson's motion for mistrial. The trial court's decision is bolstered by the fact that it admonished the jury it was to completely disregard the State's attempt to call Shaina as a witness.

[¶ 38.] Anderson argues he had no option but to question Vance Streyle

about Shaina's identification of Anderson and the circumstances surrounding it. Anderson claims in his appellate brief that "the defense team was led into a situation where they believe they had to discuss extremely damaging testimony against [Anderson] in an attempt to limit its effect." We do not agree. Anderson was well aware before trial that Shaina might not testify. Anderson's strategy to "limit [the] effect" of Shaina's identification of Anderson was of his own volition and while a proper trial tactic, as with most trial tactics, carried potential evidentiary consequences depending on the nature of the rest of the subsequent evidence. By questioning Vance about the photographic lineups, which neither State nor Anderson had introduced before this time, Anderson opened the door for the testimony that Shaina did in fact positively identify him. *See State v. Letcher*, 1996 SD 88, ¶ 26, 552 N.W.2d 402, 406 (ruling that the criminal defendant's trial strategy "opened the door" to unfavorable evidence); *State v.*

*New*, 536 N.W.2d 714, 718 (S.D.1995) (ruling that defendant's trial strategy "opened the door" for the introduction of testimony).[7]

## [¶ 39.] 2. Whether Anderson's constitutional right to confront a witness was denied by admission of hearsay statements.

[¶ 40.] As noted above, Shaina did not testify at trial. The trial court admitted at trial the testimony of Vance Streyle, Patty Sinclair, and Sheriff Taylor over the hearsay objections[8] of Anderson. Anderson argues, he was deprived of his constitutional right to confront Shaina at trial. US Const amend VI;[9] SD Const art VI § 7.[10] The State argues the statements Anderson challenges are excited utterances admissible under SDCL 19–16–6 and as contemporaneous statements of events or conditions under SDCL 19–16–5.[11] We agree with the State.

---

7. Furthermore, Anderson has failed to carry the burden of showing any actual prejudice resulting from the admission of this testimony. *Anderson*, 1996 SD 46, ¶ 22, 546 N.W.2d at 401. "[A]bsent a clear abuse of discretion and an actual showing of prejudice, the trial court's decision will not be disturbed on appeal." *Id.* ¶ 23 (citing *Oster*, 495 N.W.2d at 310). Proof that Anderson committed the crime for which he was convicted was overwhelming. Anderson's Bronco was littered with hair consistent with Piper's hair and fibers indistinguishable from her "Code Zero" t-shirt. The Ditch Road duct tape was laden with such hair, and was adjacent to half of her t-shirt. Anderson also made inconsistent statements to law enforcement during his interview and admitted he was at the Streyle trailer home on the morning of July 29, 1996. Further, several eyewitnesses saw a "dull black" Bronco in the area near the Streyle trailer, with two witnesses actually seeing the Bronco blocking the Streyle driveway. These witnesses saw a man in a black baseball cap walking from the house to the Bronco. Also, the Ben Franklin Crafts store clerk positively identified Anderson as the man who had purchased black Tempera paint on July 25, 1996 and who had asked if the black paint would wash off of a car. Finally, Anderson's camouflaged Bronco fitted with the platform and tie-downs in the rear compartment, along with the rest of the State's evidence, establish that

even without the statements of Shaina, the verdict would have been the same. Thus, the trial court did not abuse its discretion when it denied the motion for mistrial.

8. The record indicates the trial court was properly exercising its gate-keeping responsibility. Agent Jim Severson testified that Shaina made a statement much later, telling him of "a man from the black car with black wheels coming inside and Piper telling her to run and hide." The trial court sustained an objection to that statement.

9. The Constitution of the United States provides:

In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]
US Const amend VI.

10. South Dakota's Constitution provides:

In all criminal prosecutions the accused shall have the right to ... meet the witnesses against him face to face[.]
SD Const art VI § 7.

11. As we find admission under the excited utterance exception dispositive, we do not address admission under the present sense impression exception in SDCL 19–16–5.

[¶ 41.] Anderson first argues that before Shaina's statements could be admitted, the trial court must first have determined (1) Shaina was unavailable to testify at trial, and (2) the statements must bear adequate indicia of reliability. Anderson claims there was no showing that Shaina was unavailable pursuant to *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). However, Anderson's argument is misplaced in this case. In *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Supreme Court held that unavailability of the declarant is not constitutionally required. *See also Ring v. Erickson*, 983 F.2d 818, 820 (8th Cir.1992) (stating "whether [the hearsay declarant] was unavailable is irrelevant for purposes of the [Confrontation] Clause.").

[¶ 42.] Indeed, the rationale for this proposition is that unlike former in-court testimony, Shaina's statements provide evidence of the kidnapping context that cannot be replicated, even if Shaina were to have testified in court. *See White*, at 354, 112 S.Ct. at 742, 116 L.Ed.2d at 859 (stating that co-conspirator hearsay statements "provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court....."). The spontaneity of Shaina's statements contributes to the statements' reliability and cannot be recaptured even by later in-court testimony. *Id.* at 356, 112 S.Ct. at 742, 116 L.Ed.2d at 859.[12]

[¶ 43.] The Constitution does require that the hearsay statements bear an adequate indicia of reliability. *Ring*, 983 F.2d at 820 (citing *Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638, 652 (1990)). The reliability requirement can be met in either of two ways: "where the hearsay statement 'falls within a firmly rooted hearsay exception,' or where it is supported by 'a showing of particularized guarantees of trustworthiness.'" *White*, 502 U.S. at 356, 112 S.Ct. at 743, 116 L.Ed.2d at 859 (citing *Wright*, 497 U.S. at 816, 110 S.Ct. at 3147, 111 L.Ed.2d at 653). There is a preference for live testimony over offering out-of-court statements because of the importance of cross-examination, however, "where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *Id.* at 356, 112 S.Ct. at 743, 116 L.Ed.2d at 859; *State v. Orelup*, 520 N.W.2d 898, 901 (S.D.1994) (*Orelup II*); *Ring*, 983 F.2d at 820 (citing *White, Wright*, 497 U.S. at 815, 110 S.Ct. at 3146, 111 L.Ed.2d at 652).

[¶ 44.] The State argues Shaina's statements were excited utterances, and thus admissible under SDCL 19–16–6.[13] SDCL 19–16–6 does not require the unavailability of a witness for the statement to be admissible. The excited utterance exception to the hearsay rule is a firmly rooted hearsay exception. *Orelup II*, 520 N.W.2d at 901 (citing *White*, 502 U.S. at 355, n.8, 112 S.Ct. at 742 n.8, 116 L.Ed.2d at 858 n.8).

[¶ 45.] To fit within this exception, a hearsay statement must: (1) relate to a startling event or condition, and (2) be made by the declarant while under the

---

12. Even if the unavailability of Shaina was constitutionally required, the State has clearly shown Shaina was unavailable to testify at trial. If a young child has an "unwillingness or inability to testify," his or her testimony is unavailable for trial. *State v. Lanam*, 459 N.W.2d 656, 659 (Minn.1990). Clearly, in this case Shaina was unwilling to testify at the trial. When Shaina took the stand, and the judge asked her if she could tell what happened, she stated "I'm kind of shy" and "I don't want to." The trial court then determined Shaina was reluctant to testify and admonished the jury not to consider the State's attempt to call her as a witness.

13. SDCL 19–16–6 provides:

A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by § 19–16–4, even though the declarant is available as a witness.

stress of excitement caused by the event or condition. *Id.* (citing *State v. Orelup*, 492 N.W.2d 101, 106 (S.D.1992) (*Orelup I*); *State v. Floody*, 481 N.W.2d 242, 250 (S.D. 1992); SDCL 19-16-6). We have stated:

Lack of capacity for fabrication rather than lack of time to fabricate is the justification for this rule, and there is no pat answer as to the length of time that elapsed between the event and the utterance. "The character of the transaction or event will largely determine the significance of the time factor. The crucial point is that the court must be able to find that the declarant's state at the time he made the declaration ruled out the possibility of conscious reflection."

*Orelup I*, 492 N.W.2d at 106 (citing *State v. Bult*, 351 N.W.2d 731, 736 (S.D.1984) (citing Weinstein's Evidence, § 803(2)[01] at 803–84 (1981))).[14]

[¶ 46.] No specific time for Piper's kidnapping has been established, however, these facts help identify a time frame: when Vance called home at 12:00 p.m., there was no answer and the answering machine picked up; Piper did not show up for work at 3:00 p.m. as required; and the last time the black Bronco was observed at the Streyle trailer was 12:30 p.m. Sinclair spoke with Shaina from between 3:00 p.m. and 4:50 p.m. Thus, it can be inferred that Shaina's statements to Sinclair were made within a few hours of Piper's kidnapping, and there had been no adult interference since the abduction.

[¶ 47.] Sheriff Taylor spoke with Shaina at approximately 5:09 p.m., who, while crying, talked of a man in a black "car" and that her mother was going to die. Finally, when Vance spoke with his daughter at 6:00 p.m., the words "burst out" of Shaina, as she "babbled" without control, and was "very, very difficult to understand what she was even trying to communicate." Shaina again spoke of the man with an all-black vehicle, a tent, and the threat to her mother's life. Based on the record before us, at the time she made the statements to Sinclair, Taylor and Vance, Shaina was obviously under the stress of excitement of witnessing her mother taken right out of her home. "This Court has relaxed, nay cut back, the rigid time and spontaneity requirements when statements are made by very young children." *Orelup II*, 520 N.W.2d at 902 (citing *State v. Devall*, 489 N.W.2d 371, 378 (S.D.1992) (Henderson, J. concurring); *People ex rel. H.L.*, 386 N.W.2d 495 (S.D. 1986) (ruling hearsay statements admissible where child was still visibly upset from incident which occurred just a few hours earlier); *State v. Bawdon*, 386 N.W.2d 484,

---

**14.** However, in *Orelup I*, we reversed and remanded to the trial court because the record did not reflect a finding that the hearsay testimony related to a startling event and was made under the stress of excitement. *Orelup II*, 520 N.W.2d at 900. Thus, the trial court upon remand was instructed to make specific findings as to those requirements prior to admitting testimony under the excited utterance exception. *Id.*

However, we believe that under the facts and circumstances of this case, a remand back to the trial court for specific findings of whether Shaina's statements were made under the stress of excitement and related to a. startling event would be superfluous. If "the record is clear and yields an obvious answer to the relevant questions raised on appeal," the reviewing court may disregard the absence of findings of fact or conclusions of law. *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn. 1992) (citing *Davis v. State*, 116 Idaho 401, 775 P.2d 1243, 1247 (1989)). This approach promotes judicial efficiency because it avoids remand in cases where it is clear that the reviewing court will ultimately affirm. *Id.* Although it may be inefficient for an appellate court to review the record without the guidance of specific findings and conclusions, we make an independent review of the record even when a court has made specific findings. *Id.* We do not mean today that courts should abandon its fact-finding role; to the contrary, it is of utmost importance. However, this case involves a three-year-old girl who witnessed her mother's violent kidnapping. When contacted by Sinclair on the telephone, Shaina was hysterical and crying. Although Sinclair asked short, simple questions, Shaina could give little information except that she and her brother were alone and a man in a black car had taken her mother by threat of death.

487 (S.D.1986); *State v. Logue*, 372 N.W.2d 151, 159 (S.D.1985)); McCormick on Evidence § 272, at 207 (5th ed 1999) ("Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice [to qualify the statement as an excited utterance]."). Under these circumstances, it is reasonable to conclude that when Shaina described Piper's kidnapping to Sinclair, Taylor and Vance a few hours after the abduction, she was still under stress caused by the event. Indeed, Shaina had been left home alone with her two-year-old brother, unattended, until late afternoon when Taylor arrived. There can be no doubt that Shaina was still operating under the excitement of the circumstances surrounding Piper's kidnapping, and her statements were made under the influence of these events.

[¶ 48.] Anderson argues the relevant issue as to the reliability of Shaina's statements is not solely whether Shaina was competent to testify at trial, but whether she was competent at the time she made the statements. This argument fails. Because Shaina witnessed the kidnapping firsthand and made her statements during the excitement of the event, whether she was competent or not at the time she made them is not an issue. *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466, 473 n.10 (1988) (citing McCormick on Evidence § 297, at 858 (3d ed 1984)). Whether the declarant meets the test of competency for a witness is a major issue frequently encountered with excited utterances. *McCormick, supra* at 209. All that is required is:

> [i]n a modified manner, the witness is required to have firsthand knowledge. Direct proof of observation is not necessary; if the circumstances appear consistent with opportunity by the declarant, the requirement is met. If there is doubt, the question should be for the jury. On the theory that there is a countervailing assurance of reliability in the excitement of the event, the other aspects of competency are not applied. *Thus, an excited utterance is admissible despite the fact that the declarant was a child and would have been incompetent as a witness for that reason, or the declarant was incompetent by virtue of mental illness.*

*Id.* at 209–10. (emphasis added).

[¶ 49.] Anderson argues, relying on *Wright*, "to meet the requirements of the hearsay exception itself, it would seem that the requirement for the declarant to be able to observe, recollect, and communicate would either have to be obvious or suggested from the facts, or the court would have to make a factual inquiry." However, Anderson's argument is flawed, because the facts and circumstances involved in *Wright* are dissimilar from the case before us. *Wright* involved a two-and-a-half-year-old's statements to a pediatrician having extensive experience in child abuse cases, that she had been abused. 497 U.S. at 808, 110 S.Ct. at 3143, 111 L.Ed.2d at 648. The trial court admitted the child's statements pursuant to the residual hearsay exception. *Id.* at 811, 110 S.Ct. at 3144, 111 L.Ed.2d at 650. The Supreme Court, upon review, reversed the trial court's ruling and found that the admission of the child's hearsay statements violated the defendant's Confrontation Clause rights, because the statements did not fall within a traditional hearsay exception and lacked trustworthiness. *Id.* at 827, 110 S.Ct. at 3153, 111 L.Ed.2d at 660. The Court stated:

> Although the spontaneity of the statement and the change in demeanor suggest that the younger daughter was telling the truth when she made the statement, we note that it is possible that "[i]f there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness." [*State v. Robinson*, 153 Ariz. 191, 201, 735 P.2d 801, 811 (1987)]. Moreover, *the statement was not made under cir-*

*cumstances of reliability comparable to those required, for example, for the admission of excited utterances* or statements made for the purposes of medical diagnosis or treatment. Given the presumption of inadmissibility accorded accusatory hearsay statements not admitted pursuant to a firmly rooted hearsay exception, [*Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514, 527–28 (1986) ], we agree with the court below that the State has failed to show that the younger daughter's incriminating statements to the pediatrician possessed sufficient "particularized guarantees of trustworthiness" under the Confrontation Clause to overcome that presumption.

*Id.* at 826–27, 110 S.Ct. at 3152–53, 111 L.Ed.2d at 659–60 (emphasis added).

■■■ [¶ 50.] Thus, the presumption of inadmissibility involved in *Wright* is not present in this case, for Shaina's statements are admissible pursuant to the firmly rooted hearsay exception of excited utterances. *See State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75, 81 (1995) (stating "[f]or the purposes of the Confrontation Clause found in the Sixth Amendment to the United States Constitution[,] ... no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception."). "A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar state-

ment offered in the relative calm of the courtroom." *White,* 502 U.S. at 356, 112 S.Ct. at 742–43, 116 L.Ed.2d at 859. Moreover, a statement that qualifies for admission under a "firmly rooted" hearsay exception "is so trustworthy that adversarial testing can be expected to add little to its reliability." *Id.* at 357, 112 S.Ct. at 743, 116 L.Ed.2d at 860.[15]

■■■ [¶ 51.] In the case before us, the trial court did find Shaina was competent to testify at trial. However, there was no finding that she was competent on July 29, 1996, when the statements were made almost nine months before trial. Shaina turned four years old between the time she made the statements and the time of trial. Even if we were required to determine whether Shaina was competent at the time she made the statements, after a review of the record in this case, we conclude the circumstances surrounding Shaina's statements support a finding that she was competent at the time she made them. There are several factors courts may consider in evaluating the reliability of a child's hearsay statement, "including spontaneity, consistent repetition, the mental state of the child at the time the statements was made, use of terminology unexpected of a child of similar age, and lack of motive to fabricate." *Doe v. United States,* 976 F.2d 1071, 1075 (7th Cir. 1992) (citing *Wright,* 497 U.S. at 821–22, 110 S.Ct. at 3150, 111 L.Ed.2d at 656). "This list, however, is 'not exclusive, and courts have considerable leeway in their consideration of appropriate factors.'" *Id.*[16]

**15.** The Washington Court of Appeals has recently addressed this issue in *State v. Karpenski,* 94 Wash.App. 80, 971 P.2d 553 (1999). The court held that even though a hearsay statement falls within a hearsay exception, it may not be reliable if the declarant was incompetent at the time the statement was made. *Karpenski,* 971 P.2d at 573 (citing *Jenkins v. Snohomish County PUD,* 105 Wash.2d 99, 713 P.2d 79 (1986)). However, the court in *Karpenski* narrowed its focus to only those situations where the child is not shown to be competent at trial. In those situations, it must be shown that the child was competent at the time the statement was

made. *Id.* The court noted that "[a]rguably, a determination of competence at trial may mean that the child also was competent, or at least probably competent, at the time of the hearsay statement. If a child had the capacity to accurately perceive, he [or she] had that capacity for both trial and hearsay purposes. If a child has the capacity to remember at trial, and to relate at trial, he probably had those same capacities at the time of the earlier hearsay statement." *Id.* n.150.

**16.** This list of factors is generally only necessary to an analysis of whether the proffered

[¶ 52.] Courts have "limited the relevant circumstances to 'those that render the declarant particularly worthy of belief.' " *Id.* (citing *Wright,* 497 U.S. at 820, 110 S.Ct. at 3148, 111 L.Ed.2d at 655–56).

[¶ 53.] In this case, Shaina's statements are reliable and worthy of belief.[17] The record before us indicates there was no outside influence on Shaina after Piper's kidnapping, nor was there another competent witness who saw the kidnapping to contaminate her views and perceptions of the event. Shaina's statements were made close in time to Piper's kidnapping, and Shaina saw this traumatic event firsthand. Also, Shaina was not asked leading questions to elicit her responses; indeed, both Sinclair and Taylor asked open-ended questions of Shaina if the statements were not volunteered in the first place. *See Wallace,* 524 N.E.2d at 471 ("[S]tatements made in response to questions may still be under the stress of the event."). Sinclair and Taylor's questions of Shaina were neither coercive nor leading; most likely facilitated what was already the focus of her thoughts and did not destroy the "domination of the nervous excitement over [S.S's] reflective faculties." *Id.* at 472. Shaina completely volunteered her statements to Vance.

[¶ 54.] Shaina's statements to Sinclair, Taylor and Vance are wholly consistent, and her language in describing the incident is that of a child. *See Broderick v. King's Way Assembly of God Church,* 808 P.2d 1211, 1219–20 (Alaska 1991) (stating child's statements indicated trustworthiness when the record established they were made without undue suggestions by someone else, the child used "childish" terminology, and the statements were consistent in identifying her abuser).

[¶ 55.] Shaina's young age at the time of Piper's kidnapping is a factor in her favor. The Eighth Circuit Court of Appeals has noted that "a declarant's young age is a factor that may substantially lessen the degree of skepticism with which we view their motives." *Id.* at 1219 (citing *United States v. Renville,* 779 F.2d 430, 441 (8th Cir.1985); *United States v. Cree,* 778 F.2d 474, 477 (8th Cir.1985) (noting a four-year-old victim's age is "a significant factor supporting the finding that the challenged statements are trustworthy")). Expert testimony in the record reinforces this factor. Dr. Pilkington[18] testified three-year-olds can be reliable reporters of events that have happened to them or that they have observed. Further, no evidence exists in the record to suggest that Shaina would have a motive to lie in making the statements describing what happened to her mother on July 29, 1996, even assuming she had the capability to do so. *Id.*

[¶ 56.] The trial court did not violate the confrontation clause in admitting the testimony of Sinclair, Taylor and Vance as Shaina's statements clearly fall under the excited utterance exception to the hearsay rule, SDCL 19–16–6, and the testimony

hearsay possesses "the circumstantial guarantees of trustworthiness of the hearsay offered under the residual exception are 'equivalent' to the guarantees that justify the specific exceptions." *Doe,* 976 F.2d at 1075 (citing *Huff v. White Motor Corp.,* 609 F.2d 286, 293 (7th Cir.1979)). We have already stated Shaina's statements were excited utterances.

17. We are mindful that we can not consider corroborative evidence in determining the reliability of a witness' statement. *Orelup II,* 520 N.W.2d at 901 n2 (citing *Wright,* 497 U.S. at 820–23, 110 S.Ct. at 3149–50, 111 L.Ed.2d at 655–57). The Supreme Court has recently reaffirmed this principle. *See Lilly v. Virginia,* 527 U.S. 116, 137–38, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117, 135 (1999) (stating "[w]e have squarely rejected the notion that 'evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears "particularized guarantees of trustworthiness." ' ' "). We have only considered the circumstances surrounding Shaina's statements in determining their reliability.

18. Dr. Pilkington testified she had not been present in the room during the court's competency evaluation/play session, and was never briefed by law enforcement as to any evidence they uncovered in their investigation of Piper's disappearance.

contains "particularized guarantees of trustworthiness."

**[¶ 57.] 3. Whether Anderson was brought to trial within 180 days.**

[¶ 58.] Anderson argues he is entitled to dismissal because he was not brought to trial within 180 days as required by SDCL 23A–44–5.1. Anderson claims the trial court erred when it found good cause existed to extend the trial date.

[¶ 59.] Subsection 4 of the 180–day rule provides that certain periods are to be excluded in computing the 180–day period. *State v. Pellegrino*, 1998 SD 39, ¶ 23, 577 N.W.2d 590, 599 (citing *State v. Fowler*, 1996 SD 79, ¶ 12, 552 N.W.2d 391, 393). Specifically, subsection 4 excludes the following delays, in pertinent part:

(a) The period of delay resulting from other proceedings concerning the defendant, including but not limited to an examination and hearing on competency and the period during which he is incompetent to stand trial; the time from filing until final disposition of pretrial motions of the defendant, including motions brought under § 23A–8–3; [and] motions for a change of venue . . . ;

* * * *

(c) The period of delay resulting from a continuance granted by the court at the request of the prosecuting attorney if the continuance is granted because of the unavailability of evidence material to the state's case, when the prosecuting attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that such evidence will be available at the later date and provided a written order is filed;

* * * *

(f) Other periods of delay not specifically enumerated herein, but only if the court finds that they are for good cause. A motion for good cause need not be made within the one hundred eighty-day period.

The 180–day period begins to run from the date of the defendant's first appearance before a judicial officer on an indictment, information, or complaint. SDCL 23A–44–5.1(2). Subsection 5 provides:

If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the defendant shall be entitled to a dismissal with prejudice of the offense charged and any other offense required by law to be joined with the offense charged.

[¶ 60.] State filed a motion for continuance on October 24, 1996, supported by affidavits which established that the state lab had, to that point, received 965 items of potential evidence, much of which still had to be tested. Also, DNA testing was underway in Maryland which would not be completed until two weeks before trial, which would not allow Anderson time for his own DNA testing.[19] Finally, many more items discovered by the State in its on-going investigation needed to be submitted for DNA testing.

[¶ 61.] In its findings of fact and conclusions of law, the trial court held that Anderson had been brought to trial within 180 days of his first appearance when the periods excluded by 23A–44–5.1(4) were considered. Findings of fact are reviewed using the clearly erroneous standard. *Pellegrino*, 1998 SD 39, ¶ 23, 577 N.W.2d at 599 (citing *State v. Shilvock–Havird*, 472 N.W.2d 773, 776 (S.D. 1991)). However, we review the determi-

---

19. The trial court found that at State's request, McCook County had already paid the additional $300 per test expense for rush status on the DNA testing to cut the normal three-month testing time to one month.

The trial court also noted in its findings that Anderson's attorney Sidney Strange was un-

available in January and February of 1997 due to a previously scheduled two-month trial in Hand County, State v. Engelmann. Strange also requested an additional month after that trial to prepare for Anderson's defense.

nation of whether the 180–day period has expired, as well as what constitutes good cause for delay, under a de novo standard. *Id.* (citing *Fowler,* 1996 SD 79, ¶ 10, 552 N.W.2d at 392 (citing *State v. Cooper,* 421 N.W.2d 67, 69 (S.D.1988))).

[¶ 62.] Anderson first appeared before Magistrate Judge Kiner on August 2, 1996, and on April 8, 1997, jury selection began. From that 258 days, 170 days are to be excluded as time spent disposing of Anderson's pretrial motions and the delay accompanying the DNA testing by the State. *See id.* ¶ 24 (holding from the 272 days it took to bring the defendant to trial, 139 days were to be excluded as time spent disposing of defendant's pretrial motions); *State v. Wimberly,* 467 N.W.2d 499, 503 (S.D.1991) *abrogated on other grounds by State v. Moeller,* 1996 SD 60, 548 N.W.2d 465 (1996) (ruling trial court did not violate the 180–day rule when it granted the State's motion for good cause delay when delay was caused by not yet available DNA test results from the FBI); *see also Tapscott v. State,* 106 Md.App. 109, 664 A.2d 42, 49 (1995) (ruling the "State's need to obtain crucial DNA evidence that could not reasonably have been obtained earlier is sufficient good cause for a postponement" of trial beyond the 180–day deadline). After excluding these periods of delay as enumerated in SDCL 23A–44–5.1(4)(a), (c) and (f), we conclude Anderson was brought to trial well within the 180 days allowed by SDCL 23A–44–5.1(1).

[¶ 63.] **4. Whether the trial court abused its discretion in denying Anderson's motion to suppress evidence derived from his interrogation interview.**

[¶ 64.] Anderson argues his motion to suppress evidence derived from his inter-

view with police, should have been granted because he claims he requested and was denied an attorney.

[¶ 65.] Whether a suspect is "in custody" and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact qualifying for independent review. *State v. Gesinger,* 1997 SD 6, ¶ 7, 559 N.W.2d 549, 550. We review a trial court's decision on a suppression motion under an abuse of discretion standard of review. *Id.* ¶ 8 (citing *State v. Ramirez,* 535 N.W.2d 847, 848 (S.D.1995) (citing *State v. Flegel,* 485 N.W.2d 210, 213 (S.D. 1992))). "Unless such discretion is exercised to an end or purpose not justified and clearly against reason and evidence, the trial court's decision should stand." *Id.* (citing *Ramirez,* 535 N.W.2d at 848 (citing *State v. Almond,* 511 N.W.2d 572, 574 (S.D.1994))).

[¶ 66.] The trial court found that Anderson's statements were voluntary and the interview was noncustodial. Specifically, the trial court found during the first fifty-five pages of the interview transcript, Anderson was not in custody and his statements were freely and voluntarily made.[20] The court also found at no time prior to page fifty-five of the transcript did Anderson withdraw his consent to be interviewed or ask to leave. All of the statements Anderson desired to suppress were contained in the first fifty-five pages of the interview transcript, with the exception of one statement pertaining to the blue jeans Anderson was wearing, which came later in the transcript. The trial court found within the first fifty-five pages only certain references to polygraph examinations were inadmissible. We are bound by these find-

20. The State only introduced and used at trial the first fifty-five pages of the interview transcript. After a review of the transcript, the trial court concluded the interview became custodial at page 89, line 21 of the transcript, when the officers informed Anderson they were seizing his jeans and shoes pursuant to a search warrant. The court concluded any statements made by Anderson after that point were inadmissible in the State's case-in-chief. The trial court went on to conclude that because the entire interview was voluntary, the entire transcript was admissible for impeachment purposes at trial if Anderson testified. Anderson did not testify at trial.

ings unless they are clearly erroneous. *Id.* ¶ 14, 559 N.W.2d at 551 (citing *State v. DeNoyer,* 541 N.W.2d 725, 731 (S.D.1995)).

[¶ 67.] On July 30, 1996, police officers went to Anderson's home to ask him for an interview. The officers testified their objective was either to clear Anderson or find out if he had been to the Streyle home the previous day. When they arrived at the Anderson home, he was apparently asleep, but he soon came outside. Anderson readily agreed to give the officers an interview. He drove his Bronco to the police station after the officers suggested he drive his own vehicle so he would not have to be given a ride back to his home. Officers testified that at this time, Anderson appeared very relaxed and comfortable.

[¶ 68.] The interview began at approximately 1:45 p.m., with DCI Special Agents Mennenga and Grandpre, present. The interview continued until 9:26 p.m. Mennenga and Grandpre testified that due to a mistake, they did not check in with the agent who was to videotape the interview, hence, the first two to five minutes were not recorded.

[¶ 69.] The agents testified Anderson was advised at the beginning of the interview that he was not under arrest and was free to leave at any time. Anderson indicated he understood, and the interview began in a conversational manner. Anderson was not given *Miranda* warnings. Further, the agents testified Anderson did not request an attorney. Anderson, on the other hand, alleges he requested an attorney, but was denied one. Anderson testified at the motion hearing and now on appeal alleges Grandpre told

him he would not need an attorney if he had nothing to hide. Essentially, Anderson alleges his request for an attorney was made during those first two to five minutes while the interview was not taped; in effect, Anderson claims the agents purposefully did not record his request for an attorney.

[¶ 70.] Agent Mennenga testified that after Anderson asked about self-locking doors in the room, he propped open the door of the interrogation room, as it did have an automatic lock.[21] When Anderson was asked if he would take a polygraph test, he refused, explaining he thought the tests were unreliable and knew such tests were inadmissible in court.[22] Anderson also discussed the law enforcement experiences of his father and brother, and described his own arrest when he was seventeen years old. He also stated he was an intelligent man and was taking college courses in chemistry.

[¶ 71.] During the interview the officers asked Anderson if he had been out to the Streyle residence. Anderson replied he had been there on Friday morning, July 26. He stated he had met a white male and a white female he assumed was the man's wife. Anderson related the conversation he had that morning with the Streyles concerning the bible camp. Later in the interview Anderson admitted to being at the Streyle trailer on the morning of July 29 – that he was there "like yesterday morning, I guess, around 11:00[.]" Anderson stated he had just pulled in to the driveway, but when he saw no vehicles he figured the Streyles were not home. However, when the officers told him there had been a vehicle there, Anderson

---

21. Anderson focuses heavily on the issue of the self-locking doors. Anderson claims he did not know the doors were self-locking. However, whether the door was open, or closed and locked, is not decisive on this issue. We have previously held a closed, or even locked, door does not, in and of itself, create a custodial interrogation. *State v. Thompson,* 1997 SD 15, ¶ 28, 560 N.W.2d 535, 541 (citing *State v. Darby,* 1996 SD 127,

¶ 26, 556 N.W.2d 311, 319 (citing *State v. McQuillen,* 345 N.W.2d 867, 870 (S.D.1984))).

22. While the trial court ruled any references to the polygraph test were inadmissible at trial, we find Anderson's answers indicate he was knowledgeable of the law, which goes to the second voluntariness factor, level of intelligence and education. *See infra,* ¶ 82.

agreed, but stated he had just backed the Bronco out of the driveway and left without getting out. Anderson also stated he had heard Piper was missing, and that the media had reported there were children alone at the Streyles', but that he had not seen any children at the trailer. Anderson then contradicted himself, stating when he knocked on the door, there was no answer but "I heard the kid say something, and that's all I heard. You know, I mean, nobody answered." In light of this information, Mennenga prepared affidavits for search warrants for Anderson's home, Bronco and his person.

[¶ 72.] At the completion of the interview transcript used at trial, it appears Anderson was still very relaxed. At times, two officers were in the room with him, sometimes one, other times no one was with him.

[¶ 73.] Anderson asserts the trial court erred in denying his motion to suppress testimony regarding incriminating statements he uttered during the interview on July 30, 1996. His argument is two pronged: (1) the interview was custodial in nature, undertaken without his Fifth Amendment right to counsel; and (2) the State failed to prove, beyond a reasonable doubt, that his statements were freely and voluntarily made. We reject both arguments.

[¶ 74.] The first portion of Anderson's suppression argument, is grounded on his allegations that his request for an attorney was ignored. The Fifth Amendment to the United States Constitution provides in part: "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const.Amend V. The Fifth Amendment privilege against self-incrimination is implicated whenever an individual is subjected to a *custodial* interrogation by the police. *State v. Rhines*, 1996 SD 55, ¶ 11, 548 N.W.2d 415, 426 (citing *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966)) (emphasis added). If an individual indicates at any time before or during questioning that he wishes to remain silent or that he wants an attorney, the interrogation must end. *Id.* Anderson's argument that he was denied his right to counsel in the interview fails because the July 30 interview was not undertaken in a custodial situation.

[¶ 75.] There is no dispute Anderson was not read his *Miranda* rights prior to interviewing him at the police station. *Miranda* warnings are required whenever a defendant is interrogated while in police custody. *State v. Herting*, 2000 SD 12, ¶ 8, 604 N.W.2d 863, 864 (citing *Thompson*, 1997 SD 15, ¶ 23, 560 N.W.2d at 540). This Court has recently stated:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*Id.* (citing *Thompson*, 1997 SD 15, ¶ 23, 560 N.W.2d at 540 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977))).

[¶ 76.] The test in determining whether *Miranda* warnings are required "is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave." *Id.* ¶ 9, (citing *Thompson*, 1997 SD 15, ¶ 24, 560 N.W.2d at 540 (quoting *Darby*, 1996 SD 127, ¶ 25, 556 N.W.2d at 319)).

[¶ 77.] As noted above, the trial court found Anderson went to the police station voluntarily, and was not restrained in any manner during his stay there. The trial court found it was not until Anderson was informed the police were seizing his clothing pursuant to a warrant that the situation became custodial. In fact, at that time the officers did inform Anderson he was not free to leave until officers brought him some pants and shoes. But as indicated in the first fifty-five pages of the interview transcript, which was the only portion used at trial, Anderson was free to leave at any time. No threats or physical force were used. *Thompson,* 1997 SD 15, ¶ 28, 560 N.W.2d at 541 (citing *McQuillen,* 345 N.W.2d at 870). At the end of the interview as previously promised, he was allowed to leave and return to his home in a family vehicle.

■ [¶ 78.] Anderson's testimony at the motion hearing was that he requested an attorney at the very beginning of the interview, but that it "was clear they were not going to allow him to see an attorney." Agents Mennenga and Grandpre both testified Anderson did not request a lawyer. Since the first two to five minutes of the interview were not recorded, we have no absolute way of knowing whether Anderson did in fact request an attorney. However, the trial court had an opportunity to judge the credibility of both the interviewing agents and Anderson at the motion hearing. "The trial judge was in a better position to decide any conflicts in evidence as he was exposed to the conduct, temperament, and demeanor of the witnesses involved." *State v. Jenner,* 451 N.W.2d 710, 718 (S.D.1990) (citing *State v. Brim,* 298 N.W.2d 73, 78 (S.D.1980)). It is for the trial court to resolve conflicts in the evidence. *Id.* (citing *McQuillen,* 345 N.W.2d at 871). As previously stated, admissibility of evidence at a hearing on a motion to suppress is solely within the province of the trial court and its ruling will not be reversed absent a clear abuse of discretion. *Gesinger,* 1997 SD 6, ¶ 8,

559 N.W.2d at 550. The trial court in this case was free to disbelieve Anderson's assertion that he had requested an attorney prior to videotaping. *See Townsend v. State,* 813 S.W.2d 181, 186 (Tex.App.1991) (holding trial court had the discretion to disbelieve the defendant's bare assertion that he had requested an attorney prior to videotaping, when the defendant failed to subsequently request counsel after videotaping began).

■ [¶ 79.] Anderson also claims after he was allegedly denied his request for an attorney, he felt as if he was not free to leave. However, Anderson's subjective thoughts as to whether he was free to leave are not a proper basis for the determination of whether he was in custody. *Herting,* 2000 SD 12, ¶ 13, 604 N.W.2d at 866 (citing *Thompson,* 1997 SD 15, ¶ 25, 560 N.W.2d at 540). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* (citing *Gesinger,* 1997 SD 6, ¶ 18, 559 N.W.2d at 552). When the officers arrived at Anderson's residence on July 30, they told him "they thought he may have some information regarding the missing woman...." "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* ¶ 9, 604 N.W.2d at 865 (citing *Stansbury v. California,* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293, 300 (1994)). The trial court found:

> That at the onset of [Anderson's] interview, he was not the sole focus of the investigation, and given the discrepancy in the color of his vehicle and the vehicle seen at or near [Piper's] residence on the date of the kidnapping, and the inability of [Piper's] family to identify [Anderson's] driver's license photo in a lineup, law enforcement officers were

unsure as to whether [Anderson] was the individual seen at [Piper's] residence a few days before the offense occurred[.]

A reasonable person in Anderson's situation would have understood the agents wanted to know if he had any information on Piper's disappearance and that he was not their sole suspect at the onset of the interview. Anderson brought up the fact during the interview that he had left his name and number with Vance on July 26, and stated "I figured if you guys wanted to get ahold of me, you had my name and number." Anderson even stated that he "figured that is why [the officers] were out talking [to him]."

[¶ 80.] Anderson further claims his statements should be suppressed because they were involuntarily made. When this Court examines a claim of involuntariness of statements we consider the effect the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne. *Thompson*, 1997 SD 15, ¶ 29, 560 N.W.2d at 541–42 (citing *Darby*, 1996 SD 127, ¶ 28, 556 N.W.2d at 319 (citing *State v. Dickey*, 459 N.W.2d 445, 447 (S.D.1990))). The factors we consider in making such a determination include: (1) the defendant's youth; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of his constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of questioning; and (6) the use of physical punishment such as the deprivation of food or sleep. *Id.* In reviewing the trial court's finding on voluntariness, we consider the evidence in the light most favorable to the finding. *Id.* (citing *Dickey*, 459 N.W.2d at 447 (citing *State v. Oltmanns*, 519 N.W.2d 602, 605 (S.D. 1994))).

[¶ 81.] The facts of this case establish Anderson participated in the July 30 interview of his own accord and fully cooperated. Anderson's age and education are factors weighing in favor the trial court's findings of voluntariness. Anderson was twenty-six years old at the time of the interview. In addition, Anderson was not uneducated or weak-minded, as he had completed his GED, was taking college courses in engineering and indicated he was familiar with the criminal justice system. *See Jenner*, 451 N.W.2d at 718 (noting defendant's age (31) and education (two-year college degree) are factors that weighed in favor of the trial court's finding). In fact, Anderson even states during the interview "[y]ou know, I'm a fairly intelligent person. I mean, I'm taking college classes, you know." Anderson thus was capable of some degree of resistance to interrogation, had he chosen to resist. *Id.*

[¶ 82.] His responses in the interview do not suggest a lack of education or low intelligence. The interrogation was not custodial so there was no advice regarding Anderson's constitutional rights, although as we noted above, Anderson was informed he was not under arrest and was free to leave, until the search warrant discussion. The length of the detention was approximately eight hours, with a break sometime during the interview as Anderson was provided with food and drink and met with his wife. While Anderson indicated to the officers at some point that he was tired, Anderson had gotten at least two hours of sleep before the officers arrived at his home. There is no evidence from the demeanor of the interview that Anderson was exhausted or having trouble answering questions.

[¶ 83.] Anderson readily agreed to go to the police station of his own volition, and drove his own vehicle there. In fact, at one point during the trip the agents lost sight of Anderson and his vehicle but were not concerned. They met him inside the police station. A review of the interview transcript indicates Anderson's willingness to participate in the interview. The suppression hearing testimony of the agents who interviewed him reveals cooperation. *Jenner*, 451 N.W.2d at 717.

[¶ 84.] Anderson also alleges there was a coercive nature to the interview. He points to page 16 of the transcript, where the officers indicate they were worried or troubled by Anderson's statements. The officers also asked Anderson if "there would be any reason that someone would tell them he had gotten out of his vehicle." Anderson claims the investigators had no information as to whether Anderson got out of his vehicle on July 29; the officers testified they knew some of the answers to their questions. Finally, Anderson points to the officer's statement that there was more that he was not telling "as I don't think you would stop there and give up quite that easily."

[¶ 85.] "Deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider, however, the police may use some psychological tactics in interrogating a suspect." *Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d at 320 (citing *Jenner*, 451 N.W.2d at 719). We have reviewed the interview transcript and hold these questions or comments to be minimal, especially when viewed in the totality of the circumstances. We further determine they did not have such an effect on Anderson's free will as to be coercive or manipulative such that he was not able to make an independent decision to make the incriminating statements.

[¶ 86.] **5. Whether the trial court erred in admitting Jamie Hammer's testimony.**

[¶ 87.] Before trial, State made an "Amended Motion to Admit Other Acts Evidence and Statements of Anderson." The trial court admitted all of the evidence presented by State with four exceptions[23] as relevant to the kidnapping charge both under SDCL 19–12–5 (prior acts). Anderson argues the trial court erred in

admitting Hammer's testimony because it involves prior bad acts evidence, and is thus inadmissible under SDCL 19–12–5 (FRE 404(b)). State argues the evidence is relevant and admissible under the plan, motive, intent and identity basis for admission under SDCL 19–12–5. We agree.

[¶ 88.] Anderson objects to the admission of testimony concerning his prior statements to Hammer about his preparations for kidnapping women. Hammer testified that Anderson and he had previously talked about abducting women. Specifically, Hammer testified to two particular instances, one in Egan, South Dakota and the other in Sherman, South Dakota. Hammer testified that in Egan, Anderson and he had followed a girl that had pulled out in front of them. Hammer testified Anderson had said "we could have grabbed her." Hammer also testified Anderson had taken him to a house in Sherman, showing him a home with "a good looking girl living there with a kid and a big fucking boyfriend." Both of these incidents occurred during a discussion about abducting women. The owner of the residence in Sherman indicated to police that no females resided there at that time; however, there was an occasion in the fall of 1995 when his sister-in-law, who fit the description Anderson gave Hammer, had stayed at his residence. Law enforcement located and took photographs of an attractive young woman in Egan, the woman Anderson had previously followed.

[¶ 89.] Finally, Hammer testified to the fact Anderson owned "walkie talkies." The mention of "walkie talkies" also came up during a discussion about kidnapping women. Evidence seized from Anderson's Bronco included a walkie-talkie, along with a shovel with fresh dirt on it, and a pair of handcuffs and two handcuff keys on the key ring with his vehicle keys. Anderson

---

**23.** The four exceptions were (1) the existence of toggle switches in the Monte Carlo formerly owned by Anderson; (2) the tire poppers found at Anderson's home and any discussions between Jamie Hammer and Anderson concerning the use of the device; (3) any discussion of an incident where Anderson picked up a hitchhiker and discussed her potential abduction; and (4) the handcuffing incident of Stacy Pederson.

had discussed several methods of abducting women, one in which involved the use of walkie-talkies. Hammer testified Anderson and he had practiced using walkie-talkies at an area near the Big Sioux River and Ditch Road.[24] It was also in this area that the search for Piper uncovered several items of physical evidence: half of the black and white t-shirt, the length of duct tape containing numerous human head hairs, a vibrator, and a partially burned candle. Hammer testified Anderson had suggested to him different methods of disposing of bodies and getting rid of evidence. For example, Anderson talked about digging a grave in advance of an abduction and disposing of evidence by either burying it or throwing it out the window of his vehicle.[25]

[¶ 90.] The trial court found the evidence presented through Hammer was evidence admissible as statements of Anderson under SDCL 19–16–3 (Rule 801(d)(2))[26] and as prior bad acts evidence under the plan, motive and intent exceptions to SDCL 19–12–5 (Rule 404(b)). Anderson argues this evidence did not fall into any of the exceptions under Rule 404(b), i.e., "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[¶ 91.] SDCL 19–12–5 provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

[¶ 92.] The trial court correctly applied the two criteria necessary to make the decision whether to admit Hammer's testimony:

(1) Whether the intended purpose for offering the other acts evidence is relevant to some material issue in the case (factual relevancy), and

(2) Whether the probative value of the evidence is substantially outweighed by its prejudicial effect (logical relevancy).

*Moeller,* 1996 SD 60, ¶ 13, 548 N.W.2d at 472 (citing *State v. Steele,* 510 N.W.2d 661, 667 (S.D.1994)). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Walton,* 1999 SD 80, ¶ 19, 600 N.W.2d 524, 529 (citing SDCL 19–12–1). We note that SDCL 19–12–5 neither requires other acts to be criminal nor even wrongful. *State v. White,* 538 N.W.2d 237, 242 (S.D. 1995) (citing *State v. Dace,* 333 N.W.2d 812, 816 (S.D.1983)). When considering the admissibility of prior act evidence, this Court has stated that "no 'preliminary showing is necessary before such evidence may be introduced for a proper purpose.' " *Walton,* 1999 SD 80, ¶ 19, 600 N.W.2d at 529. (citing *State v. Wright,* 1999 SD 50, ¶ 13, 593 N.W.2d 792, 798). The trial court found the evidence is relevant to show preparation, plan, motive and intent, and that the probative value was not substantially outweighed by the danger of unfair prejudice.

---

24. Ditch Road runs north and south along the Big Sioux River.

25. Richard Frye, a co-worker of Anderson's, testified he had gone hunting with Anderson in the fall of 1995. While hunting, Anderson pointed out a secluded location to Frye near Lake Vermillion and indicated it would be a good place to bury someone if you had killed them—that "it would be a good place to bury someone covering them up with these pine needles, they'd never find them." During this time, Anderson also related his interest in obtaining a 9–mm handgun.

26. SDCL 19–16–3 provides, in relevant part: "[a] statement is not hearsay if it is offered against a party and is (1) his own statement, in either his individual or a representative capacity, . . . ."

[¶ 93.] "A trial court's determination to admit other acts evidence will not be overruled absent an abuse of discretion." *State v. Larson*, 512 N.W.2d 732, 736 (S.D.1994); *State v. McDonald*, 500 N.W.2d 243, 245 (S.D.1993); *State v. Werner*, 482 N.W.2d 286, 288 (S.D.1992). "Upon review ... we must be careful not to substitute our reasoning for that of the trial court." *Larson*, 512 N.W.2d at 736. Thus, the question is not whether, had we been the trial judge, would we have admitted the prior bad acts evidence but whether the trial court sitting in this case abused its discretion by doing so. *Id.; State v. Rufener*, 392 N.W.2d 424, 426 (S.D.1986).

[¶ 94.] As noted above, the trial court found in the alternative the prior bad acts established through the testimony of Hammer are relevant and admissible under the "common plan, design or scheme" exception in SDCL 19–12–5 to show preparation, plan, motive and intent. The "common plan, design or scheme" refers to a larger continuing plan, scheme or conspiracy of which the present crime charged at trial is only a part and which is often relevant to show motive, intent, knowledge or identity. *State v. Smith*, 477 N.W.2d 27, 33 (S.D.1991) (citing *State v. Champagne*, 422 N.W.2d 840 (S.D.1988)). The inference is that since the defendant planned to accomplish the design or scheme, he resolved to do the act and therefore probably did it. *Id.* (citing *Champagne*, 422 N.W.2d at 842). The trial court found the evidence in this case pertains to similar victims and similar crimes, and the incidents at issue were closely related in time to the kidnapping— a matter of months. In addition, the trial court found the evidence presented by the State is highly relevant to show plan and preparation. The court issued a limiting instruction to the jury that the other acts testimony could be used only as proof of motive, plan, preparation or intent. All of these issues were material to the State's circumstantial case.

[¶ 95.] Anderson does not challenge the trial court's findings that the prior bad acts occurred, although he minimizes them by labeling the Egan and Sherman incidents as nothing more than "trash talk." Anderson, however, does attack the trial court's ruling of admissibility of those acts, arguing that the dissimilarities between the prior bad acts and the offense charged are so substantial they overcome the State's claim of relevance. Anderson claims the end result is evidence which "elevated [the] 'trash talk' to a higher level in the jury's eyes." In effect, Anderson contends this evidence was admitted merely to show he is "a bad man who has committed bad acts in the past similar to the charge he is now facing." *Steele*, 510 N.W.2d at 668 n8. We disagree. Anderson's statements and actions made before Piper's kidnapping, expressing his plan to abduct young attractive women establish a chain of events and provide a context before the kidnapping.

[¶ 96.] In *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990), the court examined a case involving similar issues to the case before us. It concluded:

> Plan refers to an antecedent mental condition that points to the doing of the offense or offenses planned. The purpose in showing a common scheme or plan is to establish, circumstantially, the commission of the act charged and the intent with which it was committed. Strictly speaking, the exception is limited to evidence which shows some causal connection between the two offenses, so that proof of the prior offense could be said to evidence a preexisting design, plan or scheme directed toward the doing of the offense charged.

*Id.* at 748 (citing *State v. Marquez*, 222 Kan. 441, 565 P.2d 245 (1977)).

[¶ 97.] Testimony concerning Anderson's established plan and desired method of abducting women, specifically the Egan and Sherman incidents, was relevant to the State's theory of Anderson's intent and modus operandi—driving around in his

Bronco searching for similar white, attractive female victims. The testimony also was relevant to the State's theory of Anderson's preparation and plan in abducting women, especially testimony concerning Anderson's practice of using walkie-talkies along the Big Sioux River and Ditch Road, and his discussion of restraining a victim with tie downs in the back of a van or truck. "Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant." *White*, 538 N.W.2d at 242 (citing SDCL 19–12–1; *McDonald*, 421 N.W.2d at 494). "Any fact that tends to connect an accused with the commission of a crime is relevant and has probative value." *Id.* (citing State v. Johnson, 316 N.W.2d 652, 654 (S.D.1982)).

[¶ 98.] Anderson's pattern of discussing abducting women, methods of abducting women, disposing of the bodies and actually pointing out to Hammer women he was contemplating abducting was so well established, it constituted a plan pursuant to SDCL 19–12–5. " 'Plan' includes a common design or scheme." *Id.* (citing *Champagne*, 422 N.W.2d at 842). The trial court correctly balanced the probative value of the evidence against the prejudicial effect and concluded the probative value outweighed any prejudicial effect. The court found "the evidence presented by the State in this case is highly relevant to show plan and preparation ...." The trial court also concluded:

> [T]he evidence presented by the State in this case is necessary to prove the specific intent of the Defendant in order to meet the elements charged in the alternative counts of kidnapping ... since the absence of the victim's body makes it difficult for the State to prove intent without this evidence.

[¶ 99.] We agree with the trial court. It is highly probative to establish that Anderson, who had previously discussed abducting women and described in detail how he would do it, would have kidnapped Piper. Hammer's testimony regarding Anderson's planning and preparation to abduct women is corroborated by physical evidence obtained through the investigation of Piper's kidnapping. Anderson often discussed with Hammer different methods he would use in the abduction of women, and the manner in which such a crime would be carried out. Anderson suggested several methods of restraining or securing a victim in a truck or van with tie downs and using handcuffs, ropes or tape.

[¶ 100.] Upon seizing Anderson's Bronco, law enforcement found it was equipped with a platform in the rear cargo area made of particleboards and lumber covered with a synthetic carpet and cushioning. Two metal hoops were attached to the particleboards with metal screws and protruded through the carpeting. Two pairs of human hairs were found on the carpeted platform in the rear of the Bronco. These hairs were from a female whose DNA was consistent with the sample taken from Piper's menstrual pad. They were inconsistent with DNA of Anderson, his wife and children. Testimony from Cellmark Diagnostics witnesses established from the hair that this genetic set occurred in one in one hundred million Caucasians.

[¶ 101.] The investigation also found human blood on four areas of a pair of Anderson's blue jeans in a laundry basket in his home. Cellmark did three tests on the samples analyzing ten genetic sites on the DNA molecules: (1) PM plus DQ Alpha (six genetic sites); (2) STR (three sites, plus gender); and (3) D1S80 (one site). The stain on the third jeans sample, from the fly area, was a mixed sample with blood and sperm, from more than one person, one of whom was obviously male. Again, Anderson could not be excluded, although his wife and children were. Piper could neither be included or excluded as a source of DNA in this sample. The D1S80 test indicated that Anderson could not be excluded from being the donor, and

very weak results were consistent with Piper's DNA.

[¶ 102.] Law enforcement also found inside the Bronco a roll of duct tape which matched the ends of the piece of duct tape found near the Big Sioux River. The police also found several eyebolts, chains and ropes, which the trial court found could be used to restrain a potential victim.

[¶ 103.] A dirt-encrusted shovel and weeds were also found in Anderson's Bronco. Subsequently, with Hammer's information about the kind of wooded areas Anderson would talk about burying bodies in, the weeds were analyzed by taxonomist Dr. Gary Larson. Dr. Larson identified five plants from the weed sample, two of which, honewort and black snake root, were uncommon and only found in relatively rich forested areas associate with a river. Dr. Larson informed officers they should search along the Big Sioux River, as it was the only area within their search radius where these plants grow. These plants were found in abundance along the Big Sioux River near Baltic, South Dakota, and more specifically, along the road known as Ditch Road.

[¶ 104.] Hammer also testified he had seen Anderson with a 9–mm handgun. A spent 9–mm casing was found in the Streyle residence driveway on July 29, 1997. The trial court found that subsequent examinations of the shell casing, and other casings taken from a public shooting area where Anderson frequented, indicated that the casings matched and were fired from the same weapon.[27]

[¶ 105.] The trial court found the evidence presented in this case was distinguishable from that at issue in *Moeller.* The court found that unlike the situation in

*Moeller,* the evidence in this case showed Anderson targeted similar victims with plans to commit similar crimes. Hammer's testimony demonstrates Anderson desired to target women with similar characteristics: young, attractive women.

[¶ 106.] Further, the trial court concluded the prior acts at issue were more closely related in time to Piper's kidnapping than those in *Moeller.* The time period of Anderson's actions and statements was highly probative in that Anderson had begun planning in the fall of 1995 and Piper's kidnapping occurred on July 29, 1996. Hammer's testimony tends to establish plan, preparation, motive and intent. We cannot say that Anderson was unfairly prejudiced by the introduction of Hammer's testimony. The court's admission of this evidence along with an appropriate limiting instruction, was not clearly against reason and evidence and, as such, was not an abuse of discretion. *Id.* at 243 (citing State v. Harris, 494 N.W.2d 619, 624 (S.D. 1993)).

[¶ 107.] Affirmed.

[¶ 108.] MILLER, Chief Justice, and KONENKAMP, Justice, and JOHNSON, Circuit Judge, concur.

[¶ 109.] SABERS, Justice, concurs in result.

[¶ 110.] JOHNSON, Circuit Judge, sitting for AMUNDSON, Justice, disqualified.

SABERS, Justice (concurring in result).

[¶ 111.] I concur in result as there is no showing that the trial court abused its discretion:

On Issue 1, in denying Anderson's motion for mistrial after Shaina became unavailable to testify;

---

27. The trial court refused to admit two other forms of evidence, Hammer's testimony regarding an incident where Anderson picked up a hitchhiker and discussed her potential abduction, and the handcuffing incident of Stacey Pederson. The court concluded any relevance of the incident involving the hitchhiker was of minimal value and therefore was outweighed by its prejudicial effect.

The trial court concluded the possession of handcuffs by Anderson was relevant to the elements of the case and admissible; however, the testimony of Stacy Pederson regarding the handcuffing incident had little relevance and was outweighed by its prejudicial effect.

On Issue 2, in admitting the statements of Shaina to others as excited utterances;

On Issue 3, on the 180 day rule;

On Issue 4, in determining that Anderson's statements to the officers were voluntarily and freely given; and

On Issue 5, in admitting the testimony of Jamie Hammer under the "common scheme or plan" exception of SDCL 19–12–5. Anderson's defense was simply that he did not commit the acts charged. Motive was not a material issue. The same is true of intent. *United States v. Jenkins*, 7 F.3d 803, 806–07 (8thCir.1993) (holding that if a defendant denies the act occurred, then intent is not in dispute); *United States v. Powell*, 587 F.2d 443, 448 (9thCir.1978) (determining "[w]hen a defendant denies participation in the act or acts which constitute the crime, intent is not a material issue for the purpose of applying Rule 404(b) [SDCL 19–12–5]."). Therefore, we need not reach the exceptions of motive, intent or identity, and may, in fact, create error if we do so.